In re CHATEAUGAY CORPORATION, Reomar, Inc., The LTV Corporation, et al., Debtors.

LTV AEROSPACE AND DEFENSE COMPANY, Vought Industries, Inc. and Vought International, Inc., Plaintiffs,

v.

THOMSON–CSF, S.A. and VT Missile Company, Defendants and Counterclaim Plaintiffs,

v.

The LTV CORPORATION, LTV Aerospace and Defense Company, Vought Industries, Inc. and Vought International, Inc., Counterclaim Defendants.

Bankruptcy Nos. 86 B 11270 (BRL)—86 B 11334 (BRL), 86 B 11402 (BRL) and 86 B 11464 (BRL).

United States Bankruptcy Court, S.D. New York.

June 21, 1993.

Kaye, Scholer, Fierman, Hays & Handler, New York City (Myron Kirschbaum, Scott Berman, Deborah Lewis, and Donald Levinsohn, of counsel), for plaintiffs and counterclaim defendants.

Shearman & Sterling, New York City (George J. Wade, and Alan Goudiss, of counsel), for defendants and counterclaim plaintiffs.

MEMORANDUM DECISION ON PLAINTIFFS' MOTION FOR SUMMARY JUDGMENT AND TO DISMISS COUNTERCLAIMS

BURTON R. LIFLAND, Chief Judge.

## I. INTRODUCTION

This adversary proceeding arises out of the application, dated March 3, 1992 (the "Application"), of The LTV Corporation, LTV Aerospace and Defense Company ("LTVAD") and certain affiliated entities (collectively, "LTV") for an order, pursuant to sections 105, 363 and 365 of the Bankruptcy Code, 11 U.S.C. §§ 101–1330 (1993) (the "Code"), authorizing the transfer of substantially all of the assets of the aircraft and missiles divisions of LTVAD to the Vought Corporation ("Vought"), a joint venture formed by subsidiaries of Lockheed Corporation ("Lockheed") and Martin Marietta Corporation ("Martin Marietta"), for consideration valued at approximately $355 million, subject to higher and better offers. On April 10, 1992, following a highly publicized bidding contest and extensive hearings on the Application, this Court approved a competing joint offer for LTVAD's assets submitted by The Carlyle Group, a Washington, D.C. based merchant banking firm ("Carlyle"), and Thomson–CSF, S.A., a diversified electronics and aerospace concern owned sixty-percent by the French government ("Thomson"), for aggregate consideration valued at approximately $450 million.

Throughout the hearings on the Application, LTV favored approval of the Vought offer, notwithstanding a disparity of some $65 million between the $450 million joint Thomson/Carlyle offer and a final competing bid of $385 million (plus certain contingent consideration) by Vought. LTV's decision to support the Vought offer was based, in large measure, on the national security risks associated with the Thomson/Carlyle offer which were not present in the Vought offer. Based upon official communications from the United States government, there was an apparent risk

that Thomson, a French controlled company, would be unable to obtain the approvals necessary to perform LTVAD's defense contracts. As discussed more fully in the background section that follows, acquisitions of U.S. defense contractors by foreign companies require various governmental approvals, including approval by the U.S. Department of Defense ("DOD") and ultimately approval by the President pursuant to the Exon–Florio Amendment of the Defense Production Act of 1950.[1]

To assuage the concerns of interested parties, including the Pension Benefit Guaranty Corporation, LTV's single largest creditor, and ultimately win Court approval of its bid notwithstanding the apparent national security risks, Thomson agreed in open court during the bidding contest to provide a $20 million "non-refundable deposit" or "reverse break-up fee,"[2] payable in the event that Thomson failed to close its agreement to purchase the missiles division assets for reasons directly or indirectly related to its inability to obtain the requisite U.S. government approvals. The reverse break-up fee agreement was embodied in section 6.06 of an asset purchase agreement dated as of April 21, 1992 between LTV and Thomson (the "Purchase Agreement").

Despite its publicly expressed confidence that it would succeed in its negotiations with the U.S. government, Thomson failed to receive the necessary governmental approvals. On July 28, 1992, Thomson announced that it regarded the Purchase Agreement as terminated, and informed LTV that it would not proceed with the closing which was then scheduled to occur on July 31, 1992. LTV entered into negotiations with other potential suitors, including Loral Corporation ("Loral"). Ultimately, orders were entered on August 20, 1992 approving various transactions pursuant to which the aircraft division assets were sold to Carlyle and the missiles division assets were sold to Loral for aggregate consideration valued at $475 million.

In the interim, LTV demanded that Thomson pay the $20 million reverse break-up fee based upon Thomson's failure to close under the Purchase Agreement. Thomson refused, and on August 3, 1992, LTV commenced this adversary proceeding against Thomson seeking, among other things, an order compelling Thomson to pay to LTV the $20 million reverse break-up fee. LTV's adversary complaint alleges that Thomson's failure to pay constitutes a breach of section 6.06 of the Purchase Agreement and this Court's April 21, 1992 order approving that agreement (the "Approval Order"). The Approval Order was affirmed by the district court and the Second Circuit Court of Appeals. *See In re Chateaugay Corp.*, 973 F.2d 141 (2d Cir. 1992).

Thomson, for its part, denied the material allegations of LTV's complaint and filed seven counterclaims.[3] Thomson alleges, *inter alia*, (i) that it was used as a "stalk-

---

1. The Exon–Florio amendment was enacted as part of the Omnibus Trade and Competitiveness Act of 1988. *See* Pub.L. No. 100–418, 102 Stat. 1107, 1425–26 (1988) (amending Title VII of the Defense Production Act of 1950, 50 U.S.C.App. § 2158, *et seq.*). "The principal purpose of [Exon–Florio] is to authorize the President to suspend or prohibit any ... acquisition ... by or with a foreign person, of a person engaged in interstate commerce in the United States when, in the President's view, the foreign interest exercising control over that person might take action that threatens to impair the national security." 31 C.F.R. § 800.101 (1992).

2. A "break-up fee" is a form of bidding incentive that is sometimes employed where sales are subject to subsequent higher and better offers. Under a break-up fee arrangement, the seller agrees to pay an agreed sum to an initial bidder

if the seller later accepts, or a court finds, a subsequent offer to be higher and better. *See In re Integrated Resources, Inc.*, 135 B.R. 746, 750 (Bankr.S.D.N.Y.), *aff'd*, 147 B.R. 650 (S.D.N.Y. 1992). In this case, because the seller, LTV, was entitled to payment if the agreement with the buyer, Thomson, did not close, the parties referred to the arrangement as a "reverse" break-up fee.

3. Count One alleges breach of contract; Count Two alleges breach of warranties; Count Three alleges fraud and negligent misrepresentation; Count Four is labeled "Lost Profits and Other Consequential Damages [Due to] LTV's Breaches of Contract ..."; Count Five is labeled "Right to Terminate"; Count Six is labeled "Recovery of Fees and Expenses"; and Count Seven alleges unjust enrichment.

ing horse" by LTV, which bitterly fought the sale of the missiles division assets of LTVAD to Thomson; and (ii) that LTV never intended to, and in fact did not, live up to its contractual and court-ordered obligations. In particular, Thomson contends that LTV failed to use reasonable efforts to consummate the transaction, as it was required to do under both the Purchase Agreement itself and the Approval Order. In addition, Thomson contends that LTV made material misrepresentations, and concealed material facts and information with respect to, *inter alia*, the extent to which LTVAD's revenues were derived from military contracts requiring access to a type of classified information known as "Communications Security Information" or "COMSEC." As a result, according to Thomson, it was excused from performing its obligations under the Purchase Agreement.

Before the Court are several motions with respect to the adversary proceeding commenced by LTV. LTV moves for summary judgment pursuant to Fed.R.Civ.P. 56(c), made applicable herein by Fed. R.Bankr.P. 7056, against Thomson on its first (breach of the Approval Order), second (breach of the Purchase Agreement) and third (request for turnover of the reverse brake-up fee) claims for relief. LTV also moves pursuant to Fed.R.Civ.P. 12(b)(6), made applicable herein by Fed. R.Bankr.P. 7012, for dismissal of counts two, three, four, five, six and seven of Thomson's counterclaims for failure to state a claim upon which relief may be granted. Alternatively, LTV moves pursuant to Fed.R.Civ.P. 9(b), made applicable herein by Fed.R.Bankr.P. 7009, for an order dismissing, in part, count three of Thomson's counterclaims for failure to plead fraud with particularity. Finally, LTV moves pursuant to Fed.R.Civ.P. 56(c), made applicable herein by Fed.R.Bankr.P. 7056, for an order granting summary judgment dismissing counts one through seven of Thomson's counterclaims.

According to LTV, the counterclaims asserted by Thomson are nothing more than a blatant attempt to evade its obligation to pay the $20 million reverse break-up fee, which it agreed to pay in open court and in

the Purchase Agreement, and which, LTV correctly notes, was an intrinsic part of this Court's decision to approve the Thomson bid for the missiles division assets of LTVAD. Thomson, on the other hand, submits that the claims and counterclaims asserted in this adversary proceeding are interrelated and fact-intensive, and therefore poorly suited for resolution on a paper record, prior to discovery and without a trial.

After a thorough analysis of the parties' voluminous submissions and with due regard for the procedural context of the motions before the Court, the Court does not find a sufficient basis on the developed record to grant LTV's motion for summary judgment on the affirmative claims contained in its complaint and as to count one of Thomson's counterclaims. However, the Court grants LTV's motion for summary judgment on counts two and three of Thomson's counterclaims and grants LTV's motion to dismiss counts four through seven of Thomson's counterclaims. Having provided a brief introduction to the motions before the Court and the contentions of the litigants, I will describe the pertinent background facts.

## II. BACKGROUND

### A. *LTVAD's Business*

On July 17, 1986 (the "Filing Date") and thereafter, LTVAD and sixty-four affiliated companies filed voluntary petitions for relief under chapter 11 of the Code. Prior to the transfer of substantially all of its assets, LTVAD, a subsidiary of The LTV Corporation, was a leading manufacturer of military and commercial aerospace and defense products.

LTVAD operated separate aircraft and missiles divisions. The aircraft division was primarily a subcontractor for military and commercial air structures and components and advanced development programs. It employed close to 10,000 people and had revenues of approximately $1.015 billion in 1991, of which 60% were derived from military subcontracts, and 40% for commercial aircraft hardware. The missiles division was primarily engaged in the design, re-

search and development and/or production of missiles and missile related systems. It employed over 4,000 people and had revenues of approximately $750 million in 1991, of which 98% were derived directly or indirectly from military contracts.

## B. *The Marketing of LTVAD and the Applicable Security Classifications*

In early 1991, LTV determined, as a matter of business judgment, that the transfer of substantially all of the assets of the aircraft and missiles businesses of LTVAD and its affiliates would be in the best interests of the LTV estate. In reaching its decision, LTV considered, among other things, the continuing decline in DOD spending generally and the risks involved in maintaining LTVAD's business, particularly in view of the fact that approximately 75% of LTVAD's aggregate revenues were derived, directly or indirectly, from contracts with the U.S. Government.

LTV publicly announced in the spring of 1991 that it intended to market LTVAD. Shortly thereafter, LTV began soliciting, through its investment bankers, prospective bidders for the aircraft and missiles divisions both separately and together. LTV's investment bankers prepared de-

scriptive materials which were sent to a number of potential domestic and foreign purchasers. The materials did not mention possible security problems that a foreign purchaser might have to overcome in order to acquire the missiles division assets.[4] However, each interested party was afforded access to a data room that contained information on LTVAD's businesses, including copies of LTVAD's primary military contracts. Attached to each contract was a form (designated by the DOD as Form DD254) which listed the security clearances necessary to perform that particular contract.

During the summer of 1991, LTVAD's management made presentations to interested parties, including Thomson. Although the parties dispute much of what occurred during this time period, the record is clear that Thomson representatives asked LTVAD's representatives general questions concerning security obstacles it might face as a foreign owner, and specific questions concerning the percentage of LTVAD's missiles division revenues derived from military contacts involving certain types of classified information including, Top Secret, Special Access and Sensitive Compartmented.[5] According to LTV,

---

**4.** Under regulations promulgated by the DOD, every company that performs U.S. Government contracts which require access to classified information, must receive a Facility Security Clearance. However, a company that is subject to foreign ownership, control or influence (known as "FOCI"), such as VT Missile Company ("VT Missile"), Thomson's Delaware incorporated acquisition entity, cannot perform classified military contracts unless steps are taken to insulate the foreign ownership. The obvious concern is that classified information will pass through the American affiliate's hands to the foreign owner and possibly beyond, thereby jeopardizing national security.

Nevertheless, DOD regulations provide foreign acquirors methods to sufficiently minimize the effect of FOCI, such that the affiliate may be permitted to obtain and maintain a facility clearance, obtain access to classified information, and participate in classified DOD defense work. Of the various methods, the only one considered by Thomson to be a viable option was the special security agreement ("SSA"). Under an SSA the foreign company can operate the U.S. based subsidiary, here VT Missile, but must set up controls that ensure that only properly cleared U.S. citizens are exposed to infor-

mation that implicates national security. Under DOD regulations, SSAs are limited to owners of foreign companies based in countries, such as France, with which the United States has reciprocal security agreements. *See* DOD Industrial Security Regulations (DoD 5220.22–R) (December 1985).

**5.** There are three general categories of classified information. In ascending order, they are Confidential, Secret and Top Secret. In addition, within each general category, the government also classifies certain categories of information access to which may be necessary in order to perform a contract. The information categories include: (a) Communications Security ("COMSEC") information; (b) Restricted Data, as defined in the U.S. Atomic Energy Act of 1954, as amended; (c) Special Access Program ("SAP") information; and (d) Sensitive Compartmented Information ("SCI").

Pursuant to government policy, an SSA will not afford access to certain types of information, including Top Secret, Restricted Data and COMSEC. In order to obtain access to these categories of information, a company operating under an SSA would have to obtain from the appropriate U.S. armed service a formal written

approximately 5–7% of the missiles division's revenues fell into these categories. At the time, Thomson apparently and incorrectly assumed for itself that, when it asked LTV the percentage of missiles division revenues derived from contracts involving such categories of classified information, this was the equivalent of asking the percentage of LTV's business that could not be covered by an SSA. By all accounts, Thomson failed to ask—and LTV did not volunteer (at least until the beginning of April 1992)—the percentage of missiles division revenues derived from contracts requiring access to COMSEC information.[6]

On November 11, 1991, Thomson submitted its first formal bid for the missiles division assets in the amount of $220 million. On December 13, 1991, Thomson representatives met with LTV representatives to discuss Thomson's offer. At that meeting, LTV's representatives informed Thomson that its offer was not under active consideration because another party (actually a joint venture between Lockheed and Martin Marietta, i.e., Vought) had made an offer for both the missiles and aircraft divisions, and also because LTV believed that the national security problems associated with the Thomson bid would be insurmountable.

LTV's national security concerns did not deter Thomson, however, because of Thomson's alleged belief that only 5–7% of the missiles division's revenues were at risk of not being covered by an SSA. In addition, Thomson had begun negotiations with the DOD for a workable SSA. Accordingly, Thomson set out to find an appropriate bidding partner for the aircraft division assets. Thomson ultimately identified Carlyle, a Washington, D.C. based merchant banking firm headed by former Secretary of Defense Frank Carlucci.

## C. The Court Approval Process

The Court established the return date of the Application as the deadline for submitting competing bids. In accordance with such deadline, Thomson and Carlyle submitted to this Court coordinated but separate offers that aggregated $400 million for the missiles and aircraft divisions. The Court granted a one week adjournment of the hearing on the Application in order to afford interested parties a full opportunity to consider the competing Thomson/Carlyle bids.

On the same day, Thomson's president was informed by representatives of the Army and the DOD that they were concerned about Thomson's bid due to the government's belief that as much as 70% of the missiles division's revenues derived from contracts requiring access to COMSEC information. Thomson determined that the source of that information was LTV, and was supplied in order to discourage Thomson from pursuing its bid.[7] In addition, based on the experience of Thomson executives who had worked in classified areas, Thomson believed that access to COMSEC would be limited to very discrete parts of affected contracts, and that a workable SSA could therefore be negotiated with the DOD.

Five days after the first hearing date, on April 6, 1992, Assistant Secretary of Defense Duane Andrews wrote a letter to Thomson's counsel. The letter stated that an SSA for the missiles division would not "permit the performance of contracts requiring access to several categories of information, including COMSEC." In order to perform these contracts, according to

determination known as a "National Interest Determination" ("NID"). A NID is a special determination, made by the federal agency whose classified information is involved in a particular contract, that providing the company access to the requested information is in the national interest. *See* DOD Industrial Security Regulations (DoD 5220.22–R) (December 1985).

**6.** COMSEC is coding or encryption information designed to ensure the security of highly classi-

fied data. As noted in the preceding footnote, the need for access to such information in order to perform a contract requires additional security clearance.

**7.** As noted above, at the time LTV was actively supporting, pursuant to the Application, a competing Vought offer of $355 million for LTVAD's assets.

Andrews, Thomson "would have to enter into a proxy agreement or voting trust agreement."[8] In response to Thomson's request for clarification of the April 6 letter, the DOD's acting general counsel wrote a letter to Thomson's counsel on April 8, in which he stated that for contracts that required access to COMSEC, an SSA "would not be placed into effect for any purposes, including contracts that may be at the Secret level or below."

Hearings on the Application resumed again on April 8, 1992 and continued through April 10, 1992. On April 8, James Powers, the LTV officer in charge of disposition of LTVAD's assets, testified that as much as 75–80% of LTVAD's missiles division revenues derived from contracts requiring access to COMSEC information and that he believed, based upon his reading of the DOD's letters of April 6 and April 8, that this would pose an insurmountable obstacle to Thomson's receipt of a workable SSA. In rendering an evidentiary ruling raised by Thomson's counsel regarding Mr. Powers' testimony, this Court made reference to the DOD's April 6 letter to Thomson's counsel and stated this Court's view that, at a minimum, the letter "raises a very significant red flag." April 8, 1992 Transcript at 103. The Court referred to it as a "caution letter." *Id.* Thomson remained undeterred, however. It chose to discount the credibility of Powers' testimony on the belief that it was "litigation motivated" and therefore unreliable. In addition, Thomson's counsel expressed confidence that Thomson could realize a workable SSA with the DOD based on Thomson's prior experience in negotiating with the U.S. Government.

Over the three days of hearings the parties were given numerous opportunities to increase their bids. The bidding process yielded final offers of $450 million from Thomson/Carlyle and $385 million (plus certain contingent consideration) from Vought. As noted earlier, LTV nevertheless favored approval of the Vought offer due to its belief that Thomson would be unable to secure the necessary governmental approvals required to operate the missiles division. In addition, Vought's then stated public position was that it would not return to the process if the Court approved a competing offer. Thomson, however, expressed full confidence that it would be successful in negotiating with the government. Thomson's counsel stated boldly in open court that "Thomson is experienced not just in France, but has ... significant government [contracts] in this country. It knows what it is about with respect to dealing with the United States government and with the Department of Defense." April 9, 1992 Transcript at 381.

LTV's creditor and equity constituencies agreed that they would support the Thomson bid provided Thomson agreed to a reverse break-up fee payable in the event it was unable to close the transaction due to its failure to obtain the necessary governmental security approvals. The reverse break-up fee was designed, among other things, to compensate LTV for incurring the risk that its "bird in hand" (Vought) would no longer be available if the Thomson deal fell through. As noted earlier, Thomson ultimately agreed to a $20 million reverse break-up fee, and on April 10, 1992 this Court, citing the financial disparity between the two offers and Thomson's willingness to post a reverse break-up fee as significant factors in its decision, approved the Thomson/Carlyle offer.

On April 17, 1992, four days prior to the execution of the Purchase Agreement, the DOD's acting general counsel wrote to Thomson, as follows:

As you know, some of the work currently being performed by LTV requires access to Top Secret and other categories of "proscribed information" referred to in my letter of April 8, 1992. As you also know, Assistant Secretary Andrews has determined that a Special Security Agreement (SSA) would be inadequate to protect the security interests of the United States so long as the missile division under Thomson needs access to Top Se-

---

**8.** Proxy agreements and voting trust agreements are more restrictive alternatives to SSAs and, for that reason, had been considered, and rejected, by Thomson.

cret and the other categories of "proscribed information", and that a voting trust or proxy agreement is necessary to protect information of such sensitivity. Despite reports that the amount of work involving Top Secret and other categories of "proscribed information" may be approximately 5 percent, we believe the percentage is substantially larger than that. . . .

Also on April 17, James Bell, the President of one of Thomson's U.S. subsidiaries, wrote to Richard Boyle, President of LTVAD, in order to set up a meeting "to determine how the COMSEC requirements in many of the contracts can be analyzed so as to be mitigated." Mr. Bell stated that *"this is perhaps the most serious current problem."* (emphasis in original).

Despite being on notice that COMSEC was a significant concern to the *U.S. government* and, in Thomson's own words, "a serious problem," Thomson signed the Purchase Agreement on April 21, 1992 without adding any restrictions, conditions, or other modifications concerning COMSEC. Thomson continued to believe that it could negotiate a workable SSA with the DOD, notwithstanding the COMSEC problem.

Thomson determined to prepare a presentation for the DOD committee in charge of reviewing the missiles division national security issues. The presentation, in Thomson's view, would explain on a contract by contract basis why a "National Interest Determination" or "NID" was justified notwithstanding the presence of COMSEC.[9]

A May 7, 1992 meeting was scheduled with the DOD committee. On April 30, Mr. Boyle wrote a letter to Mr. Bell in which he stated that LTV would not participate in the Thomson–DOD security meeting because it did not wish to become "cross-threaded on a policy matter with a major customer." Boyle also said that LTV would not "lobby[ ] in the political or customer arena on behalf of a particular buyer." Thomson protested Boyle's position in letters to LTV's chairman as well as to co-counsel for the creditors committee of LTV Steel. Thomson's counsel also informed Boyle that failure to assist in the May 7 meeting would be viewed by Thomson as a breach of its obligations under the Purchase Agreement. Boyle subsequently attempted to countermand his April 30 letter. LTV representatives were sent to the May 7 meeting, although they did not participate in the preparation for the meeting, nor in the presentation at the meeting.

The May 7 meeting did not go well for Thomson. Assistant Secretary of Defense Stewart reiterated the government's position that the DOD would not issue a SSA and that Thomson's acquisition of the missiles division would require passive ownership in the form of a proxy agreement or voting trust. Thomson urged Stewart to withhold reaching a final determination until her committee could conduct a factual analysis of the LTV programs, which Thomson believed would show that the segregation of COMSEC was sufficient to justify the requested NIDs. Over the next two weeks, Thomson received no indication that the DOD committee was communicating with the missiles division. On May 21, based on rumor and its own belief that the DOD was not going to approve an SSA, Thomson withdrew the SSA proposal from the DOD. For the next several weeks, Thomson considered alternative security arrangements to an SSA in order to acquire the missiles division.

On July 6, Thomson withdrew its application for approval of the Purchase Agreement from the Committee on Foreign Investment in the United States before the matter had reached the President, who, under Exon–Florio, retained the final decision-making authority with respect to ap-

---

**9.** For example, Thomson planned to show that in the case of the missiles division's largest contract, the MLRS contract, a five year, $1.2 billion contract classified as Secret, COMSEC was not involved in production at all. COMSEC was only needed for a brief period of testing immediately prior to delivery of the missile. Thus, Thomson believed that it was justified in receiving a SSA for the production period of the MLRS contract and a NID to cover the testing period.

proval of the transaction.[10] Although Thomson withdrew its application from CFIUS, Thomson did not formally withdraw its offer for the missiles division assets. At a July 8 hearing in this Court, described more fully in connection with the discussion of its fifth counterclaim, Thomson's counsel stated, "[t]he voluntary withdrawal of our CFIUS notice was for the specific purpose of restructuring the transaction in such a way as to satisfy both CFIUS and the other governmental agencies." July 8, 1992 Hearing at 16. Thomson's counsel repeated this assurance in a hearing before this Court on July 21. Nevertheless, one week later, Thomson informed LTV that it considered the Purchase Agreement terminated.

### III. PROCEDURE

■ Pursuant to Rule 12(b)(6), a motion to dismiss for failure to state a claim can be granted "only if it is clear that no relief could be granted under any set of facts that could be proved consistent with the allegations." *Hishon v. King & Spalding*, 467 U.S. 69, 73, 104 S.Ct. 2229, 2232, 81 L.Ed.2d 59 (1984) (citing *Conley v. Gibson*, 355 U.S. 41, 45–46, 78 S.Ct. 99, 101–02, 2 L.Ed.2d 80 (1957)). In ruling upon a motion to dismiss, the Court must accept all factual allegations as true, *Hishon*, 467 U.S. at 73, 104 S.Ct. at 2232, and draw all reasonable inferences in favor of the non-moving party. *Cosmas v. Hassett*, 886 F.2d 8, 11 (2d Cir.1989). "[T]he issue is not whether [the non-moving party] will prevail but whether [it] is entitled to offer evidence to support the claims." *Scheuer v. Rhodes*, 416 U.S. 232, 236, 94 S.Ct. 1683, 1686, 40 L.Ed.2d 90 (1974).

■ Pursuant to Rule 56(c), summary judgment should be granted to the moving party if the Court determines that " 'the pleadings, depositions, answers to interrogatories, and admissions on file, together with affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law.' " *Celotex Corp. v. Catrett*, 477 U.S. 317, 322, 106 S.Ct. 2548, 2552, 91 L.Ed.2d 265 (1986) (quoting Fed.R.Civ.P. 56(c)); *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247–48, 106 S.Ct. 2505, 2509–10, 91 L.Ed.2d 202 (1986); *Knight v. U.S. Fire Ins. Co.*, 804 F.2d 9, 11 (2d Cir.1986), *cert. denied* 480 U.S. 932, 107 S.Ct. 1570, 94 L.Ed.2d 762 (1987). The mere existence of disputed facts will not preclude entry of summary judgment. *See, e.g., Knight*, 804 F.2d at 11–12. "Only disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment." *Anderson*, 477 U.S. at 248, 106 S.Ct. at 2510.

■ The movant initially bears the burden of establishing the absence of any genuine issue of material fact. *Celotex*, 477 U.S. at 322–23, 106 S.Ct. at 2552–53. That burden can be satisfied by demonstrating the absence of evidence to support the non-movant's case. *Id.* at 325, 106 S.Ct. at 2554. Once the moving party has met its burden,

> its opponent must do more than simply show that there is some metaphysical doubt as to the material facts.... In the language of the Rule, the non-moving party must come forward with 'spe-

---

**10.** The President has, pursuant to Executive Order, delegated authority for implementing Exon–Florio to an intergovernmental agency called the Committee on Foreign Investment in the United States ("CFIUS"), which is comprised of representatives from the Departments of Treasury, State, Commerce, and Defense, as well as the Council of Economic Advisors, Office of Management and Budget, and the U.S. Trade Representative. Exec. Order No. 12,661, 3 C.F.R. 618–24 (1988). The Treasury Department, which currently chairs CFIUS, has issued regulations implementing the statute. *See* 31 C.F.R. § 800.101 *et seq.* (1992). The regulations implement Exon–Florio by means of a voluntary filing system, pursuant to which the parties to a foreign acquisition notify CFIUS of a proposed transaction. 31 C.F.R. § 800.402(b)(5). The regulations provide time periods within which CFIUS may determine to undertake an investigation; CFIUS must complete any investigation undertaken and make recommendations to the President; and the President must act. The President is given the authority, among other things, to suspend the transaction if, "in the President's view, the foreign interest exercising control ... might take action that threatens the national security." *Id.* at § 800.101.

cific facts showing that there is a *genuine issue for trial....* ' Where the record taken as a whole could not lead a rational trier of fact to find for the nonmoving party, there is no 'genuine issue for trial.'

*Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.,* 475 U.S. 574, 586–87, 106 S.Ct. 1348, 1356, 89 L.Ed.2d 538 (1986) (emphasis in original, citation omitted).

Moreover, while summary judgment can be a significant hurdle to overcome, the Court of Appeals recently emphasized that:

In order to obtain ... [summary judgment], the *moving party need not prove that his opponent's case is wholly frivolous.* When a defendant has moved for summary judgment on the ground that undisputed facts reveal that the plaintiff cannot establish a central element of the claim, on which element the plaintiff has the burden of proof, and the plaintiff has failed to come forth with evidence sufficient to permit a reasonable juror to return a verdict in his or her favor on that element, summary judgment should be granted.... If the undisputed facts reveal that there is an absence of sufficient proof as to one essential element of the claim, any factual disputes with respect to other elements of the claim become immaterial and cannot defeat a motion for summary judgment.

*Burke v. Jacoby,* 981 F.2d 1372, 1379 (2d Cir.1992) (emphasis supplied, citations omitted) *cert. denied,* — U.S. ——, 113 S.Ct. 2338, 124 L.Ed.2d 249 (1993).

The Court's role in ruling on a motion for summary judgment "is not to resolve disputed issues of fact but to assess whether there are any factual issues to be tried, while resolving ambiguities and drawing reasonable inferences against the moving party." *Knight,* 804 F.2d at 11; *see also Schering Corp. v. Home Ins. Co.,* 712 F.2d 4, 9 (2d Cir.1983).

## IV. DISCUSSION

### A. *LTV's Affirmative Claims*

■ LTV's claim for payment of the reverse break-up fee derives from section 6.06 of the Purchase Agreement, which provides, as follows:

(a) If on July 31, 1992, (A) either of the conditions in Section 10.01(i) hereof shall not have been satisfied, (B) the Buyer does not have an independent right not to proceed with the Closing (whether as a result of the non-satisfaction of the conditions set forth in Section 10.01 or the right of [Thomson] to terminate this Agreement pursuant to Section 13.01, for reasons that are not related directly or indirectly to either of the conditions in Section 10.01(i) hereof and (C) [Thomson] does not proceed with the Closing, then [Thomson] shall pay to the Sellers as a nonrefundable fee an aggregate of twenty million dollars ($20,000,000) in immediately available funds by wire transfer to accounts designated by the Sellers.

Under section 10.01, Thomson's obligation to close was subject to two conditions: 1) the negotiation and execution of an SSA with the DOD, a draft of which was attached to the Purchase Agreement; and 2) the receipt of final CFIUS approval, including any action by the President pursuant to the Exon–Florio Amendment.

As noted above, on July 6, 1992, Thomson publicly announced its decision to withdraw its application for CFIUS approval of the transaction prior to CFIUS' transmittal of its recommendation to the President. Also, on July 28, 1992, Thomson publicly announced that it regarded the Purchase Agreement as terminated and informed LTV that it would not proceed to closing. Since, according to LTV, Thomson had no independent right not to proceed with the closing of the Purchase Agreement for reasons not directly or indirectly related to either of the conditions described in section 10.01(i) and, in fact, failed to close for reasons that were, indeed, directly or indirectly related to Thomson's failure to procure the requisite governmental approvals, Thomson owes LTV $20 million pursuant to section 6.06.

While not disputing LTV's interpretation of § 6.06, Thomson argues that the claims and counterclaims before the Court are interrelated. Whether it had an independent

right not to close for reasons unrelated to its failure to obtain the requisite governmental approvals, by virtue of LTV's own alleged breaches of the Purchase Agreement and the Approval Order, Thomson argues, is a disputed issue of fact precluding a grant of summary judgment on LTV's affirmative claims.

The Court finds that LTV's affirmative reverse break-up fee claims cannot be resolved in the context of summary judgment without reference to Thomson's breach of contract counterclaim, which raises the sole factual issue in this litigation—the reasonableness of LTV's efforts in assisting Thomson in procuring the necessary governmental clearances. The question of LTV's entitlement to the reverse break-up fee cannot—as LTV suggests—be severed from this fact issue. LTV's motion for summary judgment on its affirmative claims is therefore denied. The Court will now proceed to a discussion of Thomson's counterclaims and defenses, none of which, other than count one, survive LTV's motion for summary judgment and dismissal.

**B. *Thomson's Counterclaims and Defenses***

**(i) Count One—Breach of Contract**

■ Thomson's breach of contract counterclaim may be broken into two branches. The first branch alleges that LTV breached section 7.01 of the Purchase Agreement and paragraph 12 of the Approval Order, both of which obligated LTV to "use all reasonable efforts to take, or cause to be taken, all actions and to do, or cause to be done, all things necessary or desirable under Applicable Law to consummate the transactions contemplated by the [Purchase] Agreement." The second branch alleges that LTV "had knowledge of and actively supported and, by its silence, assisted in the plans and actions of Martin Marietta and Lockheed to subvert the [Purchase Agreement], and facilitate the sale of the Missiles Division, ultimately, to Martin Marietta ...," thereby breaching the Purchase Agreement by "frustrat[ing] [its] purpose." Since, according to Thomson, LTV breached the Purchase Agreement,

Thomson was not obligated to close and LTV is not entitled to payment of the reverse break-up fee. LTV moves for an order granting summary judgment dismissing both branches of Thomson's first counterclaim.

In its motion papers, LTV sets forth and discusses in detail the legal significance and meaning of the terms "reasonable efforts" and "best efforts." LTV asserts that, under principles of contract interpretation, the meaning of a reasonable efforts clause is "properly determined by the court as a question of law from the four corners of the contract." *Arledge v. Stratmar Systems, Inc.,* 948 F.2d 845, 848 (2d Cir. 1991) (citations omitted). LTV also asserts that by using the term "reasonable efforts," the parties necessarily intended to impose a lesser obligation than would have been required had they chosen to use the term "best efforts"—as they did elsewhere in the Purchase Agreement. Finally, LTV argues that even a best efforts clause is not a guarantee, it permits parties "a degree of discretion in the selection of the ... plan" of action and allows them to rely on their "good faith business judgment" as to the "best way" to achieve the desired result. *Western Geophysical Co. of America, Inc. v. Bolt Associates, Inc.,* 584 F.2d 1164, 1171 (2d Cir.1978). Applying these legal standards to the undisputed facts, LTV contends, entitles it to summary judgment on Thomson's claim that LTV breached the reasonable efforts requirement of the Purchase Agreement and the Approval Order.

As a threshold matter, the Court finds LTV's construction of the term "reasonable efforts" appropriate under the circumstances. By its motion, however, LTV asks the Court to decide, in the context of summary judgment and without affording Thomson any opportunity for discovery, whether the efforts undertaken by LTV satisfied its contractual and court-ordered obligations. This inherently fact-specific question has been placed in issue quite plainly by Mr. Boyle's April 30 letter, in which he states that LTVAD personnel would not assist Thomson in its presenta-

tion to the DOD because it did not wish "to become cross-threaded on a policy matter with a major customer." Although LTV makes much of the fact that the April 30 letter was almost immediately countermanded and that LTV officials ultimately attended the meeting, Thomson contends that LTV's mere presence at the meeting did not satisfy the reasonable efforts clause. Rather, Thomson expected LTV to assist with the presentation and allay DODs national security concerns. The Court recognizes, given Mr. Powers' testimony on behalf of LTV and the public climate in which the parties were operating, that LTV could not credibly assert that there were no legitimate national concerns raised by the Thomson transaction. Nevertheless, the issue of LTV's reasonable efforts is inherently factual in nature.

In addition, the Court of Appeals has stressed that "summary judgment should not be granted while the party opposing judgment timely seeks discovery of potentially favorable information." *Schering Corp. v. Home Ins. Co.*, 712 F.2d 4, 10 (2d Cir.1983); *Landmark Land Co., Inc. v. Sprague*, 701 F.2d 1065, 1070 (2d Cir.1983); *Quinn v. Syracuse Model Neighborhood Corp.*, 613 F.2d 438, 445 (2d Cir.1980). Here, Thomson timely served LTV with various discovery, including requests for documents, notices of depositions, and interrogatories. LTV determined not to respond to any of Thomson's discovery requests, and instead filed the instant motion for summary judgment and dismissal. In view of the foregoing, and considering, as the Court must, the available evidence in the light most favorable to Thomson, LTV's motion for summary judgment on the first branch of Thomson's counterclaims is denied.

■ Whether LTV is entitled to summary judgment on the second branch of Thomson's breach of contract claim presents a somewhat more difficult question. Unlike the first branch of Thomson's breach of contract counterclaim, the record is utterly devoid of any material facts to support the second branch. LTV, on the other hand, has filed sworn affidavits which attest on personal knowledge that "LTV provided no support—active or otherwise—to the efforts of Martin Marietta and Lockheed to oppose the transaction (either in lobbying Congress or any other arena), and had no advance knowledge of those two companies' plans and actions."

Here again, however, Thomson timely served LTV (and Martin Marietta and Lockheed) with discovery requests which, in each instance, went unanswered. Jean-Paul Perrier, a Senior Vice–President of Thomson, filed a declaration asserting that Thomson requires discovery of LTV (and Martin Marietta and Lockheed) to gain access to information supporting its claim, information which Thomson contends is within the exclusive control of such parties. Declaration of Jean–Paul Perrier, dated November 9, 1992 (the "Perrier Declaration").

LTV argues that Thomson's attempt to comply with Fed.R.Civ.P. 56(f),[11] in the form of the Perrier Declaration, is insufficient to justify denial of its motion. LTV points out that a " 'bare assertion' that evidence supporting a plaintiff's allegation is in the hands of the defendant is insufficient to justify denial of a motion for summary judgment under Rule 56(f)." *Contemporary Mission, Inc. v. U.S. Postal Service*, 648 F.2d 97, 107 (2d Cir.1981).

Notwithstanding Thomson's failure to strictly comply with Rule 56(f), the strong policy disfavoring summary judgment

---

**11.** Rule 56(f) states:
Should it appear from the affidavits of a party opposing the motion that he cannot for reasons stated present by affidavit facts essential to justify his opposition, the court may refuse the application for judgment or may order a continuance to permit affidavits to be obtained or depositions to be taken or discovery to be had or may make such other order as is just.

Fed.R.Civ.P. 56(f). A proper Rule 56(f) affidavit must explain: "(1) the nature of the uncompleted discovery, i.e., what facts are sought and how they are to be obtained; (2) how those facts are reasonably expected to create a genuine issue of material fact; (3) what efforts the affiant has made to obtain those facts; and (4) why those efforts were unsuccessful." *Burlington Coat Factory Warehouse Corp. v. Esprit De Corp.*, 769 F.2d 919, 926 (2d Cir.1985).

against a litigant who has timely sought and been denied discovery weighs against entering summary judgment. *See, e.g., Schering Corp.*, 712 F.2d at 10. The Court notes, moreover, that many of the Rule 56(f) cases relied upon by LTV in its motion papers, involve situations where an appellate court found that a lower court or courts had not abused its discretion by denying a litigant's request for *additional* discovery under Rule 56(f), where at least some discovery had already occurred. *See, e.g., First Nat. Bank of Ariz. v. Cities Service Co.*, 391 U.S. 253, 298, 88 S.Ct. 1575, 1597, 20 L.Ed.2d 569 (1968) (in which the supreme court noted that "substantial discovery" had failed to uncover any material facts supporting alleged conspiracy); *Burlington Coat Factory*, 769 F.2d at 925–27 (in which court of appeals concluded that "whatever discovery went undone was the consequence of the [opposing party's] own conduct and was in any event inconsequential"). Unlike the parties opposing judgment in *Cities Service* and *Burlington Coat Factory*, Thomson has not been afforded any discovery. Under these circumstances, LTV's motion for summary judgment on the second branch of Thomson's breach of contract counterclaim is denied.

(ii) Count Two—Breach of Warranties

■ Thomson's second counterclaim alleges breach of express and implied warranties. Under Section 10.01(a)(ii) of the Purchase Agreement, Thomson's obligation to close was conditioned upon the "representations and warranties of [LTV] contained in the [Purchase] Agreement … [being] complete and accurate at and as of the Closing Date." Failing this condition, Thomson would not have to close, and the reverse break-up fee would not be payable to LTV.

Thomson alleges that LTV was obligated to list in the disclosure schedule accompanying the Purchase Agreement, informa-

tion concerning the missiles division's COMSEC requirements in order to make the representations and warranties contained in sections 3.24 and 3.30 of the Purchase Agreement complete and accurate. Thomson further alleges that no such disclosure was made prior to signing the Purchase Agreement and that it suffered damages as a consequence. LTV moves for dismissal of Thomson's second counterclaim for failure to state a claim or, alternatively, for summary judgment.

A breach of warranties claim is contractual in nature. *CBS Inc. v. Ziff–Davis Pub. Co.*, 75 N.Y.2d 496, 503–04, 554 N.Y.S.2d 449, 453, 553 N.E.2d 997, 1001 (1990); *Metromedia Co. v. Fugazy*, 983 F.2d 350, 360 (2d Cir.1992). In order to state a claim for relief in breach of warranty a party must allege: "(1) the existence of an express warranty; (2) material breach of the warranty; (3) damages proximately resulting from the material breach; and (4) justifiable reliance on the warranty." *See Metromedia*, 983 F.2d at 360.

Pursuant to section 3.24 of the Purchase Agreement, LTV represented and warranted to Thomson that:

> Except to the extent prohibited by the Industrial Security Manual, Section 3.24 of the Disclosure Schedule sets forth all facility security clearances held by [LTVAD] and all subsidiaries and all personnel security clearances held by any officer, director, employee, consultant or agent thereof relating to the Purchased Assets or the Business.

By its terms, section 3.24 provides for the disclosure schedule to list the security clearances of LTVAD's facilities and personnel. It does not, as Thomson contends, call for the disclosure schedule to set forth information regarding the security clearances for LTVAD's individual contracts with the government.[12] Under DOD regulations, the procedures for obtaining access

---

**12.** As noted earlier, copies of LTVAD's primary military contracts, including its largest contract, the MLRS contract, were available for inspection in LTVAD's data room. Gilbert Fouce, formerly a member of Thomson's legal staff, among others, reviewed the documents in the

data room, including the MLRS contract. Declaration of Gilbert Fouce, dated November 19, 1992 at ¶ 7. The Form DD254 attached to the MLRS contract indicated that access to COMSEC information was required.

to COMSEC information are separate and distinct from the procedures for obtaining personnel and facility security clearances. Since the disclosures made by LTV relating to personnel and facility security clearances were complete and accurate, no express warranty was breached.

Section 3.30 of the Purchase Agreement provides that:

> *Material Disclosures.* No statement, representation or warranty made by any Seller in this Agreement, in any Exhibit hereto or in the Disclosure Schedule, or in any Certificate, statement, list, schedule or other document furnished to [Thomson] hereunder contains any untrue statement of material fact, or *fails to state a material fact* necessary to make the statements contained herein or therein, in light of the circumstances in which they are made, not misleading. [Emphasis added].

Thomson asserts that, since the presence of COMSEC information in LTVAD's contracts was so significant as to raise national security concerns, LTV had a duty under section 3.30 to disclose the percentage of LTVAD's revenues derived from contracts requiring access to COMSEC information in order to prevent the disclosures made under section 3.24 of the Purchase Agreement from being misleading.

As noted above, the disclosures required under section 3.24 relating to personnel security clearances and facility security clearances were correct. Section 3.30 did not impose on LTV the obligation to correct Thomson's alleged misapprehension concerning the percentage of LTVAD revenue derived from contracts involving COMSEC. Thomson's alleged misapprehension appears disingenuous in view of the fact that

its lawyers, including Mr. Fouce, reviewed the MLRS contract and Mr. Bell, Thomson's president, admits that "given the dollar amount of MLRS, approximately $1.3 billion, it alone was enough to push up the revenue percentage toward the 70 percent number used by Powers." Affidavit of James Bell, dated November 19, 1992, at ¶ 62.

In any event, even if section 3.30 did impose such an obligation on LTV, Thomson's breach of warranty claim would fail as a matter of law. Regardless of what it may have believed at an earlier stage in the process, Thomson was clearly placed on notice *prior to signing the Purchase Agreement* on April 21, 1992 (by virtue of official communications from the DOD and the testimony of Mr. Powers at the April 8 hearing) that (a) approximately 75–80% of LTVAD's revenues derived from contracts with COMSEC requirements, (b) its asserted belief that only 5–7% of LTVAD's revenues were in jeopardy of not being covered by a SSA was simply wrong, and (c) the presence of COMSEC in those contracts was a significant concern to the U.S. government.[13]

■ Thomson's decision to blind itself and sign the Purchase Agreement on April 21, without adding any reservations or conditions concerning COMSEC was either reckless or the result of a calculated risk that, based upon its assessment of the strength of its connections and those of its bidding partner (headed by a former defense secretary), Thomson would ultimately arrive at an acceptable security arrangement with the U.S. government. Under New York law, a purchaser under an acquisition agreement cannot maintain a breach of warranty claim based on the non-disclo-

---

**13.** *See, e.g.,* The DOD's April 6 and 8 letters to Thomson's counsel in which the DOD stated that in order for Thomson "to be permitted to perform LTV's contracts with access to [various categories of information, including COMSEC], Thomson would have to enter into a proxy agreement or voting trust agreement," and that if, at the time Thomson acquired the missiles division, there remained in place any contracts requiring access to those information categories, a SSA "would not be placed into effect for any purposes, including contracts that may be at the Secret level or below." In addition, by letter dated April 17, the DOD told Thomson that "despite reports that the amount of work involving Top Secret' and other categories of 'proscribed information' may be approximately 5 percent, we believe that the percentage is substantially larger than that.... As noted earlier, Thomson's own President, Mr. Bell, by letter dated April 17 to Mr. Boyle, LTVAD's President, characterized the COMSEC requirements in LTVAD's contracts as "perhaps the most serious current problem."

sure of facts contrary to a seller's warranty where the seller discloses the facts which would constitute the alleged breach, and the buyer, after learning of the information, closes on the agreement and fails to reserve its rights under the warranty. *See Galli v. Metz*, 973 F.2d 145, 151 (2d Cir.1992); *cf. CBS Inc. v. Ziff–Davis Pub. Co.*, 75 N.Y.2d 496, 504, 554 N.Y.S.2d 449, 453, 553 N.E.2d 997, 1001.

■ The undisputed facts indicate that Thomson continued to believe it could negotiate a workable SSA with the DOD notwithstanding COMSEC. As recently as the date of oral argument on this motion, counsel for Thomson admitted the fact that 70% of the revenues come from contracts with COMSEC "was not news. What was news was whether that created a serious risk." December 18, 1992 Transcript at 81. In other words, Thomson admits that it was aware of COMSEC but was unaware that it would prove to pose such a significant national security problem. Misapprehending the seriousness of accurately disclosed information does not constitute breach of warranty under New York law. For all the foregoing reasons, the Court grants LTV's motion for summary judgment on Thomson's second counterclaim.

### (iii) Count Three—Fraud and Negligent Misrepresentation

#### (a) *Fraud*

■ Thomson's fraud counterclaim, like its breach of contract counterclaim, may be broken down into two branches. The first branch alleges that LTV's representation in late 1991 that 5–7% of the missiles division's revenues derived from contracts involving "Top Secret," "Special Access" and "Sensitive Compartmented" information, was intentionally false and misleading. The second branch alleges that LTV fraudulently induced Thomson to enter into the Purchase Agreement by falsely representing that LTV would use reasonable efforts to consummate the transactions contemplated by the Purchase Agreement. LTV moves for dismissal of both branches of Thomson's fraud counterclaim for failure to state a claim or, alternatively, for summary judgment. Alternatively, LTV moves to dismiss the second branch of Thomson's counterclaim for failure to plead fraud with particularity.

The elements of common law fraud under New York law are: "(1) a material false representation or omission of an existing fact, (2) made with knowledge of its falsity, (3) with an intent to defraud, and (4) reasonable reliance, (5) that damages plaintiff." *Diduck v. Kaszycki & Sons Contractors, Inc.*, 974 F.2d 270, 276 (2d Cir.1992); *see also Murray v. Xerox Corp.*, 811 F.2d 118, 121 (2d Cir.1987); *Channel Master Corp. v. Aluminum Limited Sales, Inc.*, 4 N.Y.2d 403, 407, 176 N.Y.S.2d 259, 262, 151 N.E.2d 833, 835 (1958).

Thomson's fraud counterclaim suffers from the same defect as its breach of warranty claim. Even assuming, *arguendo*, LTV's statement that 5–7% of the missiles division's revenues derived from contracts involving "Top Secret," "Special Access" and "Sensitive Compartmented" information, could reasonably have misled Thomson into believing that the remaining percentage (i.e., 93–95%) could be covered by an SSA, Thomson's undisputed knowledge *prior to* the time it signed the Purchase Agreement (*see* Section (iv)(B)(ii) *infra*) precludes it from demonstrating the requisite element of reasonable or justifiable reliance. *See Diduck*, 974 F.2d at 276 (elements of cause of action for fraud include "reasonable reliance"); *Royal American Managers, Inc. v. IRC Holding Corp.*, 885 F.2d 1011, 1016 (2d Cir.1989) (referring to element of "justifiable reliance"); *Channel Master Corp.*, 4 N.Y.2d at 407, 176 N.Y.S.2d at 262, 151 N.E.2d at 835 (same). As noted previously, Thomson's decision to blind itself to the disclosures and sign the Purchase Agreement on April 21, without adding any reservations or conditions, once it was placed on notice that significantly more than 5–7% of the missiles divisions contracts required access to COMSEC information, may very well have been a reckless one. *See Mallis v. Bankers Trust Co.*, 615 F.2d 68, 81 (2d Cir.1980) *cert. denied*, 449 U.S. 1123, 101 S.Ct. 938, 67 L.Ed.2d 109 (1981); *Phoenix Canada Oil Co., Ltd. v.*

*Texaco Inc.,* 749 F.Supp. 525, 531 (S.D.N.Y. 1990). No discovery which Thomson may obtain in connection with its breach of contract claim could vitiate its own dispositive lack of justifiable reliance on LTV's alleged misrepresentation. Moreover, factual disputes concerning what one party said or should have said or what one party allegedly believed prior to April 1, 1992 are immaterial in light of Thomson's undisputed knowledge at the time it signed the Purchase Agreement. *See Burke,* 981 F.2d at 1379 ("If the undisputed facts reveal that there is an absence of sufficient proof as to one essential element of the claim, any factual disputes with respect to other elements of the claim become immaterial and cannot defeat a motion for Summary Judgment.")

■■■■ The second branch of Thomson's fraud claim is merely the first branch of its breach of contract claim "dressed in the garb of a fraud claim." *Songbird Jet Ltd., Inc. v. Amax, Inc.,* 581 F.Supp. 912, 924 (S.D.N.Y.1984). Thomson attempts to elevate its breach of contract claim to a fraud claim by alleging that LTV never intended to honor its representation that it would use reasonable efforts to consummate the transaction. Under New York law, "[a] failure to perform promises of future acts is merely a breach of contract.... A cause of action for fraud does not arise when the only fraud charged relates to a breach of contract." *Tesoro Petroleum Corp. v. Holborn Oil Co., Ltd.,* 108 A.D.2d 607, 608, 484 N.Y.S.2d 834, 835 (1st Dep't), *appeal dismissed,* 65 N.Y.2d 637 (1985). To convert a breach of promise to a fraud claim Thomson "must allege facts to show [LTV] *at the time the promissory representation was made* never intended to honor [its] statement." *Songbird Jet Ltd., Inc.,* 581 F.Supp. at 925 (citations omitted); *see also Soper v. Simmons Intern., Ltd,* 632 F.Supp. 244, 249 (S.D.N.Y.1986).

Thomson cites four instances prior to the signing of the Purchase Agreement in which LTV refused requests by Thomson to provide it with certain information. However, two of the instances cited by Thomson refer to its oft-mentioned claim that LTV failed to provide it with documentation concerning other-than Secret contracts, i.e., COMSEC information. As noted previously, information relating to COMSEC was available for review by Thomson in the data room, where the Forms DD254 were attached to the missiles division primary contracts. In another case, Thomson refers to LTV's refusal in January 1991 to assist Thomson in contacting its customers. At that time, however, LTV was not allowing any potential purchaser to contact its customers. Ultimately, Thomson is left with the conclusory statement that LTV's support of a competing bid "gives rise to the inference that LTV never intended to perform its contractual obligations". This Court disagrees.

### (b) *Negligent Misrepresentation*

■■■■ Thomson's negligent misrepresentation claim need be discussed only briefly. Under New York law, a plaintiff may recover under a claim for negligent misrepresentation only where there exists a special relationship akin to a fiduciary relationship between the parties. *Stewart v. Jackson & Nash,* 976 F.2d 86, 90 (2d Cir.1992); *American Protein Corp. v. AB Volvo,* 844 F.2d 56, 64 (2d Cir.1988), *cert. denied,* 488 U.S. 852, 109 S.Ct. 136, 102 L.Ed.2d 109 (1988); *Accusystems, Inc. v. Honeywell Information Systems, Inc.,* 580 F.Supp. 474, 480 (S.D.N.Y.1984). Thomson's counterclaims fail to allege that there was such a special relationship between the parties before the Purchase Agreement was executed. LTV and Thomson were parties to ordinary arm's length negotiations. Indeed, the Approval Order contains an explicit finding that the parties were "acting at arm's length...." "Since [Thomson] alleges nothing more than ordinary arm's length negotiations, its negligent misrepresentations claim fails as a matter of law." *American Protein Corp.,* 844 F.2d at 64; *see also In re Koreag, Controle Et Revision S.A.,* 961 F.2d 341, 353 (2d Cir.1992) ("[p]urely commercial transactions do not give rise to a fiduciary relationship").

(v) Count Five—Right to Terminate

■ Thomson's fifth counterclaim, as initially pled, alleged that the pendency of certain legislation known as the "Frost Amendment," which as of the proposed closing date had been passed by only the House of Representatives, provided Thomson independent grounds for termination under section 13.01(iii) of the Purchase Agreement. Section 13.01(iii) permit either party to terminate the Purchase Agreement "at any time prior to closing ... should a federal law be enacted or become applicable that makes the Purchase and Sale contemplated [by the Purchase Agreement] or the consummation of the Closing illegal or otherwise prohibited."

LTV moved to dismiss for failure to state a claim, arguing that section 13.01(iii) relied on by Thomson, by its terms, is only implicated by the existence of a law enacted prior to the proposed closing date of July 31, 1992. The Frost Amendment was enacted into law on October 23, 1992, as part of the National Defense Authorization Act for Fiscal Year 1993, Pub.L. No. 102–484, Sec. 839, 106 Stat. 2315 (1992), almost three months *after* the scheduled closing date. Had Thomson rested on its initially pled position, the Court would have dismissed counterclaim five without further analysis or discussion, since section 13.01(iii) is clearly inapplicable based upon its plain language. As a matter of common sense, it is illogical for Thomson to suggest that it had grounds to terminate the Purchase Agreement on July 31, 1992 based upon an event that had not yet occurred.

Apparently recognizing the weakness of its fifth counterclaim as initially pled, Thomson reformulated its argument concerning the Frost Amendment in its responsive memorandum. Thus, Thomson now argues that the pendency of the Frost Amendment at the time of the scheduled closing provided Thomson independent grounds for termination under section 10.-01(f) of the Purchase Agreement and under the common law. Indeed, Thomson asserts that the undisputed facts concerning the pendency and passage of the Frost Amendment and its alleged impact upon Thomson's obligations under the Purchase Agreement entitle it, as the responsive party to this motion, to an order granting summary judgment on counterclaim five, relief this Court is authorized to grant under appropriate circumstances. *See Coach Leatherware Co., Inc. v. AnnTaylor, Inc.,* 933 F.2d 162, 167 (2d Cir.1991).

Section 10.01(f) of the Purchase Agreement provides as a condition to closing that:

The purchase and sale contemplated by this Agreement and the consummation of the Closing shall not violate any federal, state, or foreign *law* or regulations thereunder. No temporary restraining order, preliminary or permanent injunction, cease and desist order or other order issued by any court of competent jurisdiction or any competent Governmental Authority or any other legal restraint or prohibition preventing the transfer and exchange contemplated hereby, or the consummation of the Closing or imposing Damages in respect thereto, shall be in effect, and *there shall be no pending or threatened actions or proceedings by any Governmental Authority* (or determinations by any Governmental Authority) or by any other Person (other than an appeal from an Order or other similar action by creditors in the Bankruptcy Court) (i) challenging or in any manner seeking to restrict or prohibit the transfer and exchange contemplated hereby or the consummation of the Closing, or to impose conditions that would be materially burdensome upon the Business, the Purchased Assets, the Buyer or any of its Affiliates in an action which, *in the written opinion of the Buyer's outside legal counsel who is reasonably acceptable to the Sellers, there is a material risk that such Person will prevail*

The first sentence of section 10.01(f) is of no greater assistance to Thomson than section 13.01(iii), since the condition contained in the first sentence of section 10.01(f) only applies to "a federal ... law," not to legislation passed by one House of Congress. Consequently, Thomson's argument is

premised upon the second sentence of section 10.01(f), which applies to "pending or threatened actions or proceedings by any Governmental Authority." Thomson asserts that the pendency of the Frost Amendment at the time of the scheduled closing constituted a pending action by a Governmental Authority providing Thomson an independent ground to terminate the Purchase Agreement.

LTV asserts that the second sentence of section 10.01(f) does not apply to pending or threatened *legislation*, but rather to pending or threatened judicial or quasi-judicial actions or proceedings, such as those specifically referred to in the section. As evidence that the term "actions" refer to judicial proceedings and not legislation, LTV points to the last sentence of section 10.01(f), which requires as a precondition for its applicability a written opinion of Thomson's outside legal counsel "who is reasonably acceptable to [LTV] that there is a material risk that such Person will prevail" in the "action." LTV points out that Thomson never presented LTV with any such opinion of counsel, acceptable or otherwise. More important, however, LTV asserts that there could not have been any such opinion because Congress does not "prevail" against a party when it enacts legislation the way a party does when it "prevails" in an action.

Based upon the foregoing, the Court finds LTV's interpretation of the contract consonant with the overall context of the section. The second sentence of section 10.01(f) was never intended to apply to pending legislation, but rather to pending or threatened judicial or quasi-judicial actions or proceedings, the merits of which lawyers may be asked to opine upon. Moreover, if the second sentence of section 10.01(f) is interpreted to encompass the enactment of laws, the first sentence, dealing specifically with that subject, would be rendered superfluous. It is axiomatic that "an interpretation of a contract that has 'the effect of rendering at least one clause superfluous or meaningless … is not pre-

ferred and will be avoided if possible.'" *Galli v. Metz,* 973 F.2d 145, 149 (2d Cir. 1992) (quoting *Garza v. Marine Transport Lines, Inc.,* 861 F.2d 23, 27 (2d Cir.1988)).[14] Section 10.01(f), therefore, provided Thomson no independent grounds for termination based upon the pendency of the Frost Amendment.

█ In any event, even if the Court were to accept Thomson's interpretation of section 10.01(f), which I decline to do, the record is clear that the pendency of the Frost Amendment would not have excused Thomson from closing because that legislation did not, as the section requires, "impose conditions that would be materially burdensome" with respect to the proposed transaction. Some background may be helpful to understand why this is so.

The Court approved the sale of LTVAD to Thomson and Carlyle over the objections of the Official Committee of Unsecured Creditors of LTVAD (the "Aerospace Committee) and the International Union, United Automobile, Aerospace and Agricultural Implement Workers of America (UAW) and UAW Local 848 (collectively, the "UAW"). The Aerospace Committee and the UAW appealed the Approval Orders to the district court (Lawrence M. McKenna, D.J.). The district court (and, ultimately, the Court of Appeals) affirmed the Approval Orders insofar as they rejected the Aerospace Committees objections, a discussion of which are not relevant here. Particularly relevant to this discussion is the portion of Judge McKenna's opinion and order, dated June 30, 1992, concerning the UAW's objection.

The UAW's objection was premised upon an expansive construction of the successorship clause of the UAW's collective bargaining agreement (the "CBA") with LTVAD, which the UAW contended required a partial purchaser of LTVAD's business (e.g., Thomson with respect to the missiles division and Carlyle with respect to the aircraft division) to assume all of the

---

**14.** For the same reasons, Thomson's statutory argument concerning the so-called "Murtha Amendment" is not well founded.

obligations of the CBA with respect to all of LTVAD's business, even obligations to employees not working for the business acquired by that partial purchaser. The UAW had argued before this Court that the approval of the sale of missiles division assets to Thomson and the aircraft division assets to Carlyle—pursuant to which each purchaser agreed to assume all of the obligations of the collective bargaining agreement with respect to the portions of the business of LTVAD which each such purchaser was acquiring—violated the successorship clause of the CBA and, therefore, could not be approved under 1113(f) of the Code. Section 1113(f) provides that "[n]o provision of [the Code] shall be construed to permit [a debtor] to unilaterally terminate or alter any provisions of a collective bargaining agreement prior to compliance with the provisions of [section 1113]." 11 U.S.C. § 1113(f).

At the conclusion of the hearings on the Application, this Court rejected the UAW's construction of the CBA, overruled its objection, and signed the Approval Order. On appeal, however, it was unclear to the district court, based upon its reading of the transcript of the Court's ruling, whether the Court had, in fact, passed upon and overruled the UAW's objection. The district court, therefore, remanded that issue to this Court for clarification.

A hearing on the district court's remand order was scheduled before this Court on July 8, 1992. By that time, of course, Thomson had withdrawn its CFIUS application two days earlier. As a consequence, the Court adjourned the hearing and directed the parties to address whether the withdrawal of Thomson's CFIUS application rendered moot the issues sought to be clarified on remand. Since Thomson had not formally withdrawn its offer and the clos-

ing was scheduled for July 31, 1992, all parties agreed that a live controversy existed between the UAW and LTVAD and the hearing was rescheduled.

In accordance with the remand order, this Court clarified its earlier ruling with respect to the UAW's objection. In particular, the Court ruled that "[n]othing in the collective bargaining agreement requires a partial purchaser of [LTVAD's] business to assume the collective bargaining agreement with respect to a part of the business which it had not purchased." Order and Findings of Fact and Conclusions of Law dated July 21, 1992 at 8. "Accordingly, the sales of substantially all of the assets relating to the aircraft and missiles divisions of [LTVAD] approved by this Court in the [Approval] Orders, pursuant to which Thomson and Carlyle have each assumed all of the obligations of the collective bargaining agreement with respect to the business each is purchasing, are consistent with the terms of the collective bargaining agreement," id. at 9, and, therefore, do not implicate section 1113 of the Code. Id.[15]

The preceding history is relevant to this decision in two important respects. First, the Frost Amendment, which became law almost three months after the scheduled closing date, would not have changed in any respect the deal that Thomson and Carlyle had struck with LTV. The relevant provision of such legislation prohibits the sale of all or any part of LTVAD's operating assets to any purchaser unless that purchaser "agrees to assume, *to the extent required under any collective bargaining agreement entered into by LTVAD,* all liabilities of LTVAD to all of the employees of LTVAD who have retired." This Court had specifically ruled, in the context of the UAW remand, that Thomson and Carlyle had, in fact, assumed all LTVAD retiree

---

15. In making this ruling, the Court relied, among other things, on the fact that "counsel for Carlyle and Thomson made clear on the record before this Court that between them they would be assuming all obligations under the collective bargaining [agreement] for aircraft and missiles divisions' employees and former employees." April 10, 1992 Transcript at 430. Indeed, Mr. Bell by letter dated May 13, 1992 to Congressman Frost stated:

The purpose of this letter is to assure you that Thomson is assuming fully LTV's existing obligations to LTV's retirees. LTV's retirees will continue to receive their pension and medical benefits as before the transaction. Thomson's commitments to LTV retirees are at least as favorable, and in some respects more favorable, as those agreed to by Lockheed and Martin Marietta pursuant to the Vought Transfer Agreement.

obligations to the extent required by the collective bargaining agreement. Second, and even more concerning to the Court is the fact that also in the context of the UAW remand I specifically asked Thomson's counsel for a so-called "weather" or status report concerning the pending transaction and, in stark contrast to Thomson's attempt at revisionist history now, Thomson's counsel responded that "the sun is still shining." Indeed, the sun was shining notwithstanding the pendency of the Frost Amendment.[16]

■ Thomson's final argument in support of its fifth counterclaim is that the pendency of the Frost Amendment at the time of the scheduled closing date provided Thomson independent grounds for termination as a matter of law under the contract defenses of frustration of purpose and impossibility. The doctrine of frustration of purpose " 'refers to a situation where an unforseen event has occurred, which, in the context of the entire transaction, destroys the underlying reasons for performing the contract, even though performance is possible, thus operating to discharge a party's duty of performance.' " *Bank of America Nat. Trust and Sav. Ass'n v. Envases Venezolanos, S.A.*, 740 F.Supp. 260, 266 (S.D.N.Y.) (citation omitted), *aff'd*, 923 F.2d 843 (2d Cir.1990). The defense of impossibility is defined as "an inability to perform as promised due to intervening events." *Id.* at 267. Clearly, neither defense applies here in view of the preceding discussion. In the end, the Frost Amendment did no more than confirm what the parties, and this Court, had already acknowledged they were obligated to do.

(vi) Count Four—Lost Profits and Other Consequential Damages; Count Six—Recovery of Fees and Expenses; Count Seven—Unjust Enrichment

■ Because Thomson's sixth and seventh counterclaims are related, they will be considered together. By its sixth counterclaim, Thomson seeks recovery of its professional fees, expenses and costs incurred through its participation in the auction process. Specifically, Thomson alleges that its participation in the auction process resulted in a benefit to the LTV estates of approximately $120 million in excess of what those estates would have received absent Thomson's participation. By its seventh counterclaim, Thomson seeks a declaration that payment of the reverse break-up fee to LTV would constitute a penalty and would thus unjustly enrich LTV at Thomson's expense. LTV moves for an order dismissing counterclaims six and seven or, alternatively, for summary judgment.

■ "The equitable doctrine of unjust enrichment rests, generally, on the principle that a party should not be allowed to enrich himself at the expense of another." *Reprosystem, B.V. v. SCM Corp.*, 727 F.2d 257, 263 (2d Cir.) *cert. denied*, 469 U.S. 828, 105 S.Ct. 110, 83 L.Ed.2d 54 (1984); *Songbird Jet Ltd., Inc.*, 581 F.Supp. at 926. "It applies to situations where no legal contract exists, 'but where the person to be charged is in possession of money or property which it in good conscience and justice he should not retain, but should deliver to another.' " *Indyk v. Habib Bank Ltd.*, 694 F.2d 54, 57 (2d Cir.1982) (quoting *Matarese v. Moore–McCormack Lines*, 158 F.2d 631, 634 (2d Cir.1946)). To maintain a cause of action for unjust enrichment, Thomson must demonstrate that (1) LTVAD has been enriched; and (2) as between LTVAD and Thomson such enrichment was unjust. *Reprosystem, B.V.*, 727 F.2d at 263: *Indyk*, 694 F.2d at 57; *Songbird Jet Ltd., Inc.*, 581 F.Supp. at 926.

The allegations of Thomson's sixth and seventh counterclaims make plain that Thomson seeks to recover under a theory

---

**16.** Thomson's eleventh hour argument raised at oral argument that the weather report given to the Court on July 21 was not with respect to the transaction approved by the Court, but some yet to be disclosed transaction that would not have been implicated by the Frost Amendment, is particularly ill taken by the Court in view of the foregoing history. If, indeed, Thomson's counsel would have disclosed that his weather report did not refer to the Court-approved transaction, but some transaction in prospect, the Court would have been precluded from rendering a decision on remand because there would be no live controversy to adjudicate.

of unjust enrichment compensation for its fees, costs, and expenses incurred through its participation in the auction process. Simply stated, any fees, costs and expenses incurred by Thomson were expended primarily to further its bid for LTVAD. Any benefit Thomson conferred upon LTVAD was merely incidental.

Accordingly, since Thomson's actions "were designed to and had the effect of protecting [its] own interests ... even if they incidentally benefitted [LTVAD], they do not give rise to an equitable claim of unjust enrichment." *Songbird Jet Ltd., Inc.*, 581 F.Supp. at 927. In *Songbird Jet Ltd., Inc.*, the court dismissed an unjust enrichment claim, holding that the "time, efforts and activities expended during [contract] negotiations" did not give rise to an unjust enrichment claim. In the words of the court:

> The parties were engaged in a normal negotiation process for the purchase and resale of a commodity and no reasonable business executive would expect payment for his own preliminary activities if they failed to achieve their objective. 'Every businessman faces the risk that the substantial transaction costs necessary to bring about a mutually beneficial contract will be lost if the negotiations fail to yield a satisfactory agreement.'

*Songbird Jet Ltd., Inc.*, 581 F.Supp. at 926 (quoting *Gruen Industries, Inc. v. Biller*, 608 F.2d 274, 282 (7th Cir.1979)).

■ Moreover, Thomson's newly stated litigation position, that payment of the reverse break-up fee to LTV would constitute a penalty, is also not well taken by this Court, given that Thomson agreed to pay the reverse break-up fee in open court as an inducement for LTV's creditor and shareholder constituencies to support its bid and this Court's decision to approve the joint Thomas/Carlyle offer was based, at least in part, on the inclusion of the parties' reverse break-up fee. In the words of Thomson's counsel, posting the reverse break-up fee was Thomson attempt to "put its money where its mouth is." Thomson never expressed the view in court then that the reverse break-up fee was an unenforceable penalty; consequently, it is estopped from doing so now. *See, e.g., Meyerson v. Werner*, 683 F.2d 723 (2d Cir.1982) (Court of Appeals applied federal law of estoppel to preclude party to settlement agreement negotiated and approved in open court from contending that a stipulated amount agreed to be paid by one party to the agreement in the event of such party's default was an unenforceable penalty); *see also Reynolds v. C.I.R.*, 861 F.2d 469 (6th Cir.1988).[17]

■ Finally, Thomson's fourth counterclaim, labeled "Lost Profits and Other Consequential Damages," rather than being an independent cause of action, evidence of which would entitle Thomson to relief, are actually methods of calculating injuries to successful plaintiffs for the purpose of measuring damages making the plaintiff whole. Thomson's own cases highlight this distinction. "Lost profits are recoverable when they result as the natural consequences of a breach of contract or the commission of a tortious act." *Levine v. American Federal Group, Ltd.*, 180 A.D.2d 575, 576, 580 N.Y.S.2d 287, 288 (1st Dep't 1992). It is the breach of contract or the tortious act that constitutes the cause

---

**17.** Moreover, were the Court to accept Thomson's argument, any liquidated damage award that exceeded a plaintiff's actual injury would give rise to a claim for unjust enrichment. This is clearly not the law in New York:

> Under New York law ... the actual damages suffered by the party for whose benefit the clause is inserted in the contract have little relevance to the validity of a liquidated damages clause. The soundness of such a clause is tested in light of the circumstances existing as of the time that the agreement is entered into rather than at the time that the damages incurred or become payable.... It thus makes no difference whether the actual damages are higher or lower than the sum stated in the clause ...

*United Merchants and Manufacturers, Inc. v. Equitable Life Insur. Society of the U.S. (In re United Merchants and Mfrs., Inc.)*, 674 F.2d 134, 142 (2d Cir.1982) (quoting *Walter E. Heller & Co., Inc. v. American Flyers Airline Corp.*, 459 F.2d 896, 898–99 (2d Cir.1972)) (citations and footnotes omitted in original). *See also Truck-Rent–A–Center, Inc. v. Puritan Farms 2nd, Inc.*, 41 N.Y.2d 420, 423–25, 393 N.Y.S.2d 365, 368–70, 361 N.E.2d 1015, 1017–19 (1970).

of action; lost profits is the remedy available to the injured party. Since lost profits and consequential damages are not "claims" upon which relief can be granted, LTV's motion to dismiss is granted.

## V. CONCLUSION

For the foregoing reasons, the Court does not find a sufficient basis on the developed record to grant LTV's motion for summary judgment on its affirmative claims in its complaint and as to count one of Thomson's counterclaims. However, the Court grants LTV's motion for summary judgment on counts two and three of Thomson's counterclaims and grants LTV's motion to dismiss counts four through seven of Thomson's counterclaims.

The parties are instructed to submit an order consistent with this memorandum decision.