In re CHATEAUGAY CORPORATION, Reomar, Inc., The LTV Corporation, et al., Debtors.

LTV AEROSPACE AND DEFENSE COM-PANY, Vought Industries, Inc., and Vought International, Inc., Appellees,

v.

THOMSON–CSF, S.A. and VT Missile Company, Appellants and Counterclaim Appellants,

v.

The LTV CORPORATION, LTV Aerospace and Defense Company, Vought Industries, Inc., and Vought International, Inc., Counterclaim Appellees.

No. 95 Civ. 9502 (JFK).
Bankruptcy Nos. 86 B 11270 (BRL) to 86 B 11334 (BRL), 86 B 11402 (BRL) and 86 B 11464 (BRL).
Adv. No. 92–9531A.

United States District Court, S.D. New York.

July 30, 1996.

Shearman & Sterling (George J. Wade, Alan S. Goudiss, Andrew W. Feinberg, Kathryn Tabner, Benjamin L. Coleman, of counsel), New York City, for Appellants and Counterclaim Appellants.

Kaye, Scholer, Fierman, Hays & Handler, L.L.P. (Myron Kirschbaum, Scott M. Berman, Robert Grass, Deborah Lewis, of counsel), New York City, for Appellees and Counterclaim Appellees.

## OPINION AND ORDER

KEENAN, District Judge:

Before the Court is an appeal taken by Thomson–CSF, S.A. and VT Missile Company (collectively, "Thomson") from two orders of the Honorable Burton R. Lifland, former Chief Judge of the United States Bankruptcy Court for the Southern District of New York in an adversary proceeding captioned *In re Chateaugay Corporation,* 86 B 11270 (BRL), 86 B 11334 (BRL), 86 B 11402 (BRL), 86 B 11464 (BRL) and Adv. No. 92–9531A. First, Thomson appeals that portion of an order dated June 21, 1993, *LTV Aerospace & Defense Co. v. Thomson–CSF, S.A. (In re Chateaugay Corp.),* 155 B.R. 636 (Bankr. S.D.N.Y.1993) (*"Chateaugay I"*) which granted LTV's motion, *inter alia,* to dismiss Thomson's fifth counterclaim against The LTV Corporation, LTV Aerospace and Defense Company ("LTVAD"), Vought Industries, Inc., and Vought International, Inc. (collectively, "LTV"). Second, Thomson appeals four aspects of the Bankruptcy Court's Findings of Facts and Conclusions of Law, dated August 23, 1995, issued following a seven day trial. *LTV Aerospace & Defense Co. v. Thomson–CSF, S.A. (In re Chateaugay Corp.),* 186 B.R. 561 (Bankr.S.D.N.Y. 1995) (*"Chateaugay II"*). LTV opposes Thomson's appeal in all respects. The Court heard oral argument on this matter on July 2, 1996. For the reasons set forth below, the decisions of the Bankruptcy Court are affirmed.

## BACKGROUND

### I. The Adversary Proceeding

This appeal from an adversary proceeding in the Bankruptcy Court arises out of an asset purchase agreement between LTV and Thomson, dated April 21, 1992 (the "Agreement"). Under the Agreement, Thomson was to purchase the assets of LTVAD's Missiles Division, a manufacturer of military and commercial aerospace and defense products. LTV commenced the adversary proceeding in August 1992 after Thomson announced that it regarded the Agreement as terminated. LTV sought to recover from Thomson a $20 million "reverse break-up fee" due under the Agreement in the event Thomson failed to

close on the purchase of the Missiles Division.

In October 1992, LTV moved for summary judgment on its claims and dismissal of Thomson's counterclaims. The Bankruptcy Court granted in part and denied in part the summary judgment motion, and granted the motion to dismiss certain of Thomson's counterclaims. One of the dismissed counterclaims was Thomson's fifth counterclaim asserting that the Agreement was terminated by virtue of the House of Representatives' passage of the Frost Amendment. *See Chateaugay I*, 155 B.R. at 653–56, 658.

The Bankruptcy Court subsequently held a seven day trial of the remaining claims in late January and early February 1995. During the trial, the parties presented the testimony of more than twenty witnesses and introduced more than 200 exhibits. On August 23, 1995, the Bankruptcy Court issued an opinion finding that LTV had satisfied its obligations under the Agreement and was therefore entitled, under the terms of the Agreement, to the $20 million reverse breakup fee promised by Thomson. *Chateaugay II*, 186 B.R. at 595–97.

## II. The Proposed Sale of the Missiles Division to Thomson

LTV, the former parent company of LTVAD, has been in bankruptcy proceedings since July 1986, when it and sixty-four related companies filed a voluntary petition in the Bankruptcy Court seeking reorganization under chapter 11 of the Bankruptcy Code. Driven by a need to raise the capital required to emerge from its historically lengthy and complex chapter 11 proceeding, LTV publicly announced in May 1991 that it intended to sell the assets of LTVAD's Aircraft and Missiles Divisions. LTVAD was a manufacturer of military and commercial aerospace and defense products whose primary customer was the United States government. In fact, 98% of the Missiles Division's revenues derived from contracts with the United States military. *Chateaugay II*, 186 B.R. at 564.

One of the entities expressing interest in the purchase of the Missiles Division was Thomson. Thomson–CSF is a manufacturer of military defense systems and components. Fifty-eight percent of the outstanding shares and seventy-five percent of the voting shares of Thomson–CSF are owned by Thomson, S.A., a corporation wholly owned by the government of France.

Representatives of Thomson met with LTVAD's management in August 1991 to discuss the potential acquisition. Concerned with the effect its foreign ownership might have on its ability to own and operate the Missiles Division, Thomson inquired about the percentage of the Missiles Division's revenue derived from work on contracts with the United States government involving classified information. LTV represented to Thomson during the meetings that the level of activity at the Missiles Division requiring access to highly classified information, referred to by LTV as "special access" or "black" programs, was in the range of approximately 5–7% of revenues. United States Department of Defense ("DOD") regulations prevented LTV from providing further information to Thomson and other prospective purchasers relating to these programs, including information necessary to enable prospective purchasers to evaluate the financial risks and rewards of such programs. *See Chateaugay II*, 186 B.R. at 588–89.

In February 1992, LTV entered into an agreement to sell the assets of LTVAD's Missiles and Aircraft Divisions to the Vought Corporation ("Vought"), a joint venture formed by subsidiaries of Martin Marietta Corporation ("Martin") and Lockheed Corporation ("Lockheed"). Vought's $355 million bid for LTVAD's assets was subject to higher and better offers.

The Bankruptcy Court held hearings in April 1992 to consider LTV's application to the court for approval of the Vought agreement. The Bankruptcy Court set the return date of the application, April 1, 1992, as the deadline for submission of competing bids for purchase of the Missiles and Aircraft Divisions.

On the return date, Thomson and The Carlyle Group ("Carlyle"), a merchant banking firm based in Washington, D.C., submit-

ted coordinated offers for LTVAD's Missiles and Aircraft Divisions. On the same day, Army and DOD representatives expressed their concern about Thomson's bid to James Bell, the president of Thomson's Delaware-based U.S. subsidiary, VT Missile Company ("VT"), the entity that had been formed for the purpose of acquiring the Missiles Division. The government representatives expressed to Bell their belief that Thomson's foreign ownership might pose a problem because as much as 70% of the Missiles Division's revenues came from contracts requiring access to classified information known as "Communications Security Information" ("COMSEC") and other categories of classified information.[1] At the hearing on that date, the Bankruptcy Court adjourned the matter for one week so that the Thomson/Carlyle bids could be considered fully.

Under regulations promulgated by the DOD, every company performing work on government contracts must receive a Facility Security clearance. To obtain such clearance, foreign-owned companies such as Thomson are required to take steps to insulate foreign ownership, control or influence ("FOCI"). One way to minimize the effect of FOCI is through a Special Security Agreement ("SSA") with the United States government. A SSA permits a foreign owner to operate a U.S.-based subsidiary, provided the foreign owner implements controls to permit only approved U.S. citizens to have exposure to information implicating national security. Because a SSA is the highest form of security clearance available to a company with FOCI, it is the most difficult to obtain. Other more restrictive alternatives to a SSA include proxy agreements and voting trusts.[2]

Despite the prospective difficulty in obtaining a SSA, Thomson was determined from the outset to secure such an agreement and had drafted a proposed SSA that would permit it to retain management control over the Missiles Division. Thomson claims that its proposed SSA was specially tailored to LTV's representations to it in August 1991 that the level of the Missiles Division's contracts involving access to highly classified information was in the range of approximately 5–7% of the Missiles Division's revenues.

Government officials were not receptive to Thomson's proposed SSA. On April 6, 1992, Thomson's counsel received a letter from Assistant Secretary of Defense Duane Andrews stating that the DOD would not authorize a SSA that would permit Thomson to perform contracts requiring access to COMSEC. Andrews suggested that Thomson instead attempt to address FOCI concerns by entering into a proxy or voting trust agreement. This letter was followed on April 8, 1992 with a letter from Acting DOD General Counsel Chester Paul Beach, Jr. confirming Andrews' assessment of Thomson's dim prospects for obtaining a SSA.

At the hearings before the Bankruptcy Court on April 8–10, 1992, Government representatives testified that the April 6 Andrews letter and the April 8 Beach letter accurately represented the DOD's position with respect to Thomson's acquisition of the Missiles Division. An officer of LTV, James Powers, also testified at the hearing that the revenues of LTVAD's Missiles Division's from contracts requiring access to COMSEC information were as high as 75–80%, a figure that he believed would pose an insurmountable obstacle to Thomson's ability to work out a viable SSA. Indeed, throughout the hearings, LTV favored Vought's lower $385 million bid to Thomson/Carlyle's $450 million offer due in great measure to the potential

---

1. The Bankruptcy Court described the various categories of classified information as follows:

There are three general categories of classified information: "Confidential," "Secret" or "Top Secret." Within each general category, certain categories of information[,] access to which may be necessary in order to perform a contract[,] are also classified. The information categories include: "Top Secret," [COMSEC], "Restricted Data," "Special Access Program

Information" and "Sensitive Compartmented Information."

*Chateaugay II*, 186 B.R. at 569 n. 3.

2. A proxy agreement allows the foreign owner to retain legal title to the stock but requires that all voting rights be irrevocably conveyed to U.S. citizens. *See Industrial Security Regulations* § 2–205(c). A voting trust requires a foreign owner to transfer legal title to its stock as well as management control to U.S. citizen trustees. *See id.* § 2–205(b).

difficulties Thomson faced in obtaining the approval of the DOD and the President of the United States necessary to perform LTVAD's defense contracts for the United States.[3]

Undeterred in its intent to purchase LTVAD's Missiles Division, Thomson endeavored through the remainder of the hearings to convince the Bankruptcy Court and LTV's creditors that it could successfully negotiate a SSA with the DOD. For instance, on April 9, 1992, Thomson's counsel stated in open court that "Thomson is experienced not just in France, but has.... significant [contracts] in this country. It knows what it is about with respect to dealing with the U.S. government and with the Department of Defense." *Chateaugay I,* 155 B.R. at 643 (citing April 9, 1992 Transcript at 381).[4] Even more significantly, Thomson made an offer on the record during the hearings to pay LTV a $20 million "reverse break-up fee" in the event that it failed to close the transaction due to an inability to obtain the requisite security approvals from the U.S. government.

On April 10, 1992, the Bankruptcy Court approved the Thomson/Carlyle offer. In approving the joint bid, the Bankruptcy Court noted that its decision had been influenced significantly by the financial disparity between Vought's and Thomson/Carlyle's offers and by Thomson's offer to pay the reverse break-up fee. *See Chateaugay I,* 155 B.R. at 643. Thomson's obligation to pay the reverse break-up fee was subsequently incorporated in section 6.06 of the Agreement signed on April 21, 1992.

Thomson spent the next months fighting an uphill battle with the U.S. government to obtain a SSA.[5] On May 7, 1992, Thomson was scheduled to make a presentation to the DOD committee responsible for reviewing national security issues associated with the transfer of the Missiles Division. Thomson requested that Missile Division representatives attend the meeting to support Thomson's presentation. Richard Boyle, LTVAD's President and Chief Executive Officer, initially expressed his reluctance to require Missiles Division personnel to attend the meeting in a letter he wrote to Bell of VT. Boyle explained in the letter that he feared antagonizing the Army, the Missiles Division's primary customer, since the Army seemed to oppose Thomson's proposed SSA. Boyle expressed this reluctance as his desire to avoid becoming "cross-threaded on a policy matter with a major customer."

---

3. Approval of the President is required under the Exon–Florio Amendment to the Defense Production Act of 1950, Pub.L. No. 100–418, 102 Stat. 1107, 1425–26 (1988). The Exon–Florio Amendment authorizes the President "to suspend or prohibit any ... acquisition ... by or with a foreign person, of a person engaged in interstate commerce in the United States when, in the President's view, the foreign interest exercising control over that person might take action that threatens to impair the national security." 31 C.F.R. § 800.101.

4. Indeed, as the Bankruptcy Court later pointed out, Thomson *did* have experience dealing with the U.S. government, but that experience should have served only to underscore to Thomson the difficulties it would face obtaining security clearance from the U.S. government:

   In 1988, Thomson–CSF attempted to acquire the assets of the Ocean Defense Corporation, known as Bendix–Oceanics, but was informed by the United States Navy that due to the extremely sensitive nature of Bendix–Oceanics work for the Navy, the applicable security regulations and restrictions would not permit the acquisition contemplated by Thomson–CSF and thus, the acquisition was terminated.

   *Chateaugay II,* 186 B.R. at 565.

5. Thomson also had a battle to fight with Congress. When Thomson's interest in acquiring the Missiles Division was revealed publicly in early 1992, numerous members of Congress, including Sam Nunn and Les Aspin, the respective chairmen of the Senate and House Armed Services Committees, vociferously objected to the proposed acquisition. Opposition to Thomson was based primarily on three concerns: (1) that national security might be compromised through the transfer of sensitive technology to France and then to hostile third world nations; (2) the potential loss of American defense industry jobs and the potential inability of American firms to compete with Thomson given its suspected subsidization by the French government; and (3) the vulnerability of American defense companies to takeover by foreign corporations. Other opposition to the Thomson acquisition derived from the disclosure by the former director of the French Secret Service in the fall of 1991 that the agency had conducted extensive industrial espionage against American companies. *See Chateaugay II,* 186 B.R. at 589 & n. 8.

After Thomson protested this position to David Hoag, LTV's Chief Executive Officer, Hoag immediately instructed Boyle to provide LTV representation at the meeting. Consequently, LTV representatives attended the May 7 meeting. The Bankruptcy Court noted that LTV personnel also assisted Thomson's representatives in preparing for the meeting, provided Thomson with the information it needed for the presentation, and participated in the meeting in a manner supportive of Thomson's position. *See Chateaugay II,* 186 B.R. at 571–73.

Although Thomson pressed its SSA proposal at the May 7 meeting, it was clear to the Thomson and LTV participants that the DOD response to Thomson's presentation was negative. The DOD held firmly to the position that the DOD would not approve a SSA for Thomson. They insisted that Thomson could proceed only with a proxy agreement or voting trust.

In addition to obtaining some form of security agreement with the DOD, Thomson also needed to obtain the President's approval of the transaction under the Exon–Florio Amendment. Pursuant to Executive Order, the power to implement the Exon–Florio legislation is delegated to the Committee on Foreign Investment in the United States ("CFIUS"), an intergovernmental agency.

On May 19, 1992, the CFIUS began its 45-day investigation of Thomson's proposed acquisition of the Missiles Division. The CFIUS submitted questionnaires to be answered by Thomson and LTV concerning the security implications of the acquisition. LTV personnel devoted thousands of hours preparing answers to the CFIUS's questions. One of the questions posed to LTV was: "To what extent does the design/production of LTV's missiles require knowledge or COMSEC technology, equipment, and technical data?" Responding to this question in a manner supportive of Thomson's acquisition, LTV's May 8, 1992 submission to the CFIUS provided as follows:

The design/production of missiles does not require knowledge of COMSEC technology, equipment, and technical data. During development of the missile system, the basic use of COMSEC equipment is to provide a secure link to transmit classified flight test data from a missile in flight to a ground receiving station. The COMSEC equipment is used in the missile to encode or encrypt the data and the COMSEC equipment in the ground station is used to decode the data. The missile designers do not require any knowledge of COMSEC equipment except encoder installation requirements (size, weight, mounting requirements) and input electrical/electronic requirements (power requirements, instrumentation data stream characteristics/limitations, etc.). This type of information does not include COMSEC sensitive data and therefore does not require transfer of COMSEC technology information to the missile subsystem and system designers. Since production missiles do not require an instrumentation and telemetry system, COMSEC equipment normally is not required in support of production programs. The COMSEC equipment is provided by the U.S. Government as Government Furnished Equipment (GFE) to the Missiles Division for those programs which have COMSEC requirements. Most of the Missiles Division employees assigned to a missile development program have no knowledge of COMSEC technology, equipment, or technical data, except such knowledge as is required to serve as custodians of the equipment. . . .

*Chateaugay II,* 186 B.R. at 575 (quoting May 8, 1992 submission).

On May 21, 1992, Thomson finally accepted defeat in its quest for a SSA and withdrew its SSA proposal from DOD consideration. Despite indications from the DOD that the only acceptable security arrangement for Thomson would be one that limited Thomson's role to that of a passive investor, Thomson next began to work on a proxy proposal that would permit it to retain certain management control over operations of the Missiles Division. The DOD informed Thomson by letter dated June 16, 1992 that this proxy proposal was inconsistent with the DOD's view of a passive investment. Accordingly, the DOD rejected the proxy proposal and stated that "a Voting Trust is necessary to negate foreign ownership control and influ-

ence." However, Thomson would not agree to enter into such an arrangement.

On July 6, 1992, Thomson withdrew its application for approval of the Agreement from the CFIUS.[6] Despite these signs of capitulation, Thomson insisted to the Bankruptcy Court that it had not abandoned its intent to go forward with the transaction. In late July, Thomson informed LTV that it had reached an agreement with Loral Corporation ("Loral") pursuant to which Loral would acquire a majority interest in the Missiles Division and Thomson would retain less than a ten percent ownership interest. However, on July 28, 1992, Thomson informed LTV that it considered the Agreement terminated. The Bankruptcy Court subsequently approved a $475 million joint offer from Loral and Carlyle for the assets of the Missiles and Aircraft Divisions.

### DISCUSSION

Thomson raises the following issues on appeal: (1) whether the Bankruptcy Court erred in finding that LTV fulfilled its obligations under the Agreement, including that LTV used "all reasonable efforts" to assist Thomson in acquiring LTVAD's Missiles Division; (2) whether the Bankruptcy Court erred in finding that communications between LTV and Martin or Lockheed after the Agreement was signed "were minimal and did not have the purpose or effect of subverting Thomson's acquisition," *Chateaugay II,* 186 B.R. at 591, and that LTV did not contact Martin to discuss a bid for the assets of LTVAD until after Thomson terminated the Agreement; (3) whether the Bankruptcy Court erred in granting LTV's motion to dismiss Thomson's fifth counterclaim and concluding that the Frost Amendment did not provide Thomson with an independent and legally sufficient reason to terminate the Agreement on July 28, 1992; and (4) whether the Bankruptcy Court erred in finding that payment to LTV of the $20 million reverse break-up fee would not unjustly enrich LTV.

**6.** Thomson's withdrawal from the CFIUS process occurred before the matter reached the Presi-

### I. LTV's Fulfillment of Its Contractual Obligations to Thomson

The Bankruptcy Court found that LTV fulfilled its obligations under section 7.01 of the Agreement, which required LTV to make "all reasonable efforts" to consummate the transaction with Thomson. Thomson contends that the following conclusions of law and/or findings of fact of the Bankruptcy Court with respect to section 7.01 constitute reversible error: (1) that section 7.01 of the Agreement "placed the burden of negotiating an SSA with the DOD on Thomson, not LTV," *Chateaugay II,* 186 B.R. at 595; (2) that section 7.01 of the Agreement did not require LTV to lobby members of Congress to change their opinions with respect to Thomson's acquisition; (3) that LTV satisfied its contractual obligations by performing the myriad tasks necessary to close the transaction and its assisting Thomson in dealing with the DOD, the CFIUS, and Congress; and (4) that Thomson withdrew from the transaction because it knew that it would not get CFIUS approval, not because of its problems with the DOD. The Court reviews the Bankruptcy Court's factual findings for clear error and its legal conclusions *de novo. See Travellers Int'l, A.G. v. Trans World Airlines, Inc.,* 41 F.3d 1570, 1574–75 (2d Cir. 1994).

### A. *LTV's Obligations Under Section 7.01*

#### 1. "Reasonable Efforts" Clause

The standard imposed by a "reasonable efforts" clause such as that contained in section 7.01 of the Agreement is indisputably less stringent than that imposed by the "best efforts" clauses contained elsewhere in the Agreement. Even in the face of a best efforts clause, however, a party is entitled to give "reasonable consideration to its own interests" in determining an appropriate course of action to reach the desired result. *Bloor v. Falstaff Brewing Corp.,* 601 F.2d 609, 614 (2d Cir.1979); *accord Triple–A Baseball Club Assocs. v. Northeastern Baseball, Inc.,* 832 F.2d 214, 226 (1st Cir.1987),

dent.

cert. denied, 485 U.S. 935, 108 S.Ct. 1111, 99 L.Ed.2d 272 (1988). A party may thus exercise discretion, within its good faith business judgment, in devising a strategy for achieving its ultimate goal. *Western Geophysical Co. of America, Inc. v. Bolt Assocs., Inc.*, 584 F.2d 1164, 1171 (2d Cir.1978). Therefore, in order to prevail upon its allegations that LTV did not exert reasonable efforts to consummate the transaction, Thomson must demonstrate that LTV's actions were inconsistent with good faith business judgments. *See Travellers Int'l, A.G.*, 41 F.3d at 1575–76.

## 2. The Parties' Contractual Obligations

Section 7.01 of the Agreement requires both LTV and Thomson to "use all reasonable efforts to take, or cause to be taken, all actions and to do, or cause to be done, all things necessary or desirable under Applicable Law to consummate the transactions contemplated by this Agreement." The generalized obligations imposed upon LTV and Thomson by this section include

> execut[ing] and deliver[ing] such other documents, certificates, agreements and other writings and [taking] such other actions as may be reasonably necessary or desirable in order to consummate or implement expeditiously the transactions contemplated by this Agreement, including the Buyer's receipt of any amounts comprising or payable in respect of any Purchased Assets and the relevant Seller's receipt of any amounts comprising or payable in respect of any Excluded Assets.

Two other sections of the Agreement are addressed specifically to Thomson's obtaining a security arrangement with the DOD. One of these sections, section 4.09, represents that Thomson has reached an agreement in principle with the Defense Investigative Service ("DIS") concerning a SSA.[7] The other, section 6.04, is a covenant by Thomson to enter into a SSA with the DOD.[8]

---

7. Section 4.09 of the Agreement provides in relevant part:

> Thomson and [VT] believe that they have reached an agreement in principle with the [DIS] concerning the terms and conditions of [a final draft SSA] and have so advised the [DIS]. No representative of the [DIS] has expressed disagreement with this characterization.

## B. *Analysis*

### 1. LTV's Assistance of Thomson with the DOD

Upon *de novo* review, the Court affirms the Bankruptcy Court's legal conclusion that section 7.01 of the Agreement "placed the burden of negotiating a SSA with the DOD on Thomson, not LTV." *Chateaugay II*, 186 B.R. at 595. The Bankruptcy Court made this determination by reading section 7.01 in conjunction with section 6.04.

■ It is a fundamental principle of contract interpretation that "definitive, particularized contract language takes precedence over expressions of intent that are general, summary, or preliminary." *John Hancock Mut. Life Ins. Co. v. Carolina Power & Light Co.*, 717 F.2d 664, 669 n. 8 (2d Cir.1983); *accord In re InterCarbon Bermuda, Ltd.*, 146 F.R.D. 64, 73 (S.D.N.Y.1993). This Court finds, in accordance with this principle, that while section 7.01 imposed certain generalized obligations upon LTV to assist Thomson in closing the transaction, section 6.04 placed the specific burden of working out a security agreement with the DOD on Thomson. As the Bankruptcy Court pointed out, section 7.01 was not relied upon by the parties where they sought to provide for the performance of specific tasks; such specific divisions of responsibility were spelled out in separate provisions of the Agreement. *See Chateaugay II*, 186 B.R. at 591–92 (citing examples). Through section 6.04, the parties likewise placed the duty to work out a security arrangement with the DOD on Thomson.

The Court further finds that even if the Agreement had required LTV to use reasonable efforts to assist Thomson in obtaining a security arrangement with the DOD, LTV fulfilled such a duty. The Bankruptcy Court

---

The DIS is an "agency of the DOD that interacts with industry participants with respect to compliance with the Industrial Security Regulations." *Chateaugay II*, 186 B.R. at 570 n. 5.

8. Section 6.04 provides: "As promptly as practicable after the date hereof, [VT] and Thomson shall enter into a special security agreement with the [DOD] in substantially the form of the Special Security Agreement."

made extensive factual findings that support a legal conclusion that LTV made reasonable efforts to assist Thomson in its negotiations with the DOD. *See Chateaugay II,* 186 B.R. at 569–73, at ¶¶ 38–76. Among these findings were that: LTV met with Thomson for five days in April 1992 and provided Thomson with information crucial to dealing with the DOD, "including information to help Thomson deal with the issue of Proscribed Information necessary to perform Missiles Division contracts"; Thomson advisors expressed their satisfaction with LTV's cooperation and the information it had provided at the April 1992 meetings; LTV personnel assisted Thomson in its May 7 presentation to the DOD by providing information necessary for the meeting and attending and participating in the meeting in a manner helpful to Thomson; and LTV continued to assist Thomson with its efforts to obtain a proxy agreement with the DOD even after Thomson withdrew its application for a SSA. *Id.*

LTV contests these factual findings in two main respects. First, Thomson claims that LTV failed to "educat[e] the DOD with respect to the nature and extent of the COMSEC requirements associated with the design and production of LTVAD's missiles." Thomson Mem. of Law at 30. Thomson argues that it was incumbent upon LTV to correct "misimpressions" it had allegedly fostered "about COMSEC and the 5–7% estimate." *Id.* at 31.

The Bankruptcy Court rejected these contentions, relying upon extensive factual findings supporting that LTV had not created any misimpressions with respect to COMSEC or the 5–7% estimate. Indeed, the Bankruptcy Court found that the 5–7% figure concerning "special access" or "black" programs and the 75–80% figure concerning the percentage of the Missiles Division's revenues derived from work requiring access to proscribed information "were [both] accurate and consistent." *Chateaugay II,* 186 B.R. at 588–89. After carefully reviewing the Bankruptcy Court's findings on this issue and the evidence upon which the findings are based, this Court concludes that those factual findings are not clearly erroneous. Therefore, the Court finds that LTV did not create any

misimpression regarding either the 5–7% estimate or the 75–80% estimate.

Nor does the Court agree with Thomson's contention that LTV failed to educate the DOD with respect to COMSEC. In this regard, Thomson particularly complains that LTV failed to supply the DOD with helpful information on COMSEC that it submitted to the CFIUS on May 8, 1992. The essence of the information LTV provided to the CFIUS was that "[t]he design/production of missiles does not require knowledge of COMSEC technology, equipment, and technical data." Thomson's presentation to the DOD on May 7 made a similar and consistent point—that "the development and testing functions in the Missiles Division contracts requiring access to COMSEC could be isolated and segregated from the production function under those contracts." *Chateaugay II,* 186 B.R. at 572. LTV supplied the information on which Thomson's May 7 presentation was based. Moreover, the DOD had access to the information LTV supplied to the CFIUS. *Id.* at 574–75. Given these facts, the Court does not find that LTV failed to use reasonable efforts to supply the appropriate Government officials with information on COMSEC that was helpful to Thomson's proposed acquisition of the Missiles Division.

Second, Thomson contends that, contrary to the Bankruptcy Court's factual finding, LTV failed to support Thomson at the critical May 7 meeting with the DOD. However, the Court finds that there is substantial evidence to support the Bankruptcy Court's factual findings that despite Boyle's initial reluctance to assist Thomson with its May 7 presentation to the DOD, LTV ultimately provided significant assistance to Thomson for the May 7 meeting. For instance, even Thomson admits—albeit grudgingly—that LTV personnel attended and participated in the May 7 meeting. *See* Thomson Mem. at 33. The evidence also supports, and Thomson does not dispute, that LTV provided the information Thomson used to make its presentation at the meeting. *See Chateaugay II,* 186 B.R. at 572–73. This assistance by LTV with the May 7 presentation constitutes a "reasonable effort" by LTV.

Although Thomson asserts that there was testimony presented to contradict the Bankruptcy Court's factual finding that a key LTV representative, Missiles Division Senior Vice President Jay Musselman, participated at the May 7 meeting, it acknowledges that there was also testimony to support the Bankruptcy Court's finding. Indeed, one of Thomson's own documents, a memorandum prepared the day after the meeting, makes clear that Musselman participated actively at the meeting. *See* R.479 at T022696 ("Jay Musselman of LTVMD clarified specific points."), T022697 ("Mr. Musselman interjected that the production contract for MLRS is performed at Camden and that the development efforts are not integrated with the production contract.").[9] Thomson therefore fails utterly to convince this Court that the Bankruptcy Court's finding was erroneous. The Bankruptcy Court had the right and duty to decide what evidence to credit in making its factual findings.

Similarly, the Bankruptcy Court's finding that "Musselman was not asked by Thomson to make a presentation at the meeting," *Chateaugay II*, 186 B.R. at 573, is not clearly erroneous. There was evidence in the record to support that finding. *See* R.59 at 90 (Musselman's deposition testimony that he was not asked to make a presentation). Although there was also evidence in the record contradicting that finding, *see, e.g.*, R.50 at 677–79 (Bell's deposition testimony that he spoke with Musselman about making a presentation at the May 7 meeting), the Court finds no clear error in the Bankruptcy Court's selection of the evidence it found to be most credible. *See Banker v. Nighswander, Martin & Mitchell*, 37 F.3d 866, 870 (2d Cir.1994) ("Where there are two permissible views of the evidence, the factfinder's choice between them cannot be clearly erroneous.").

### 2. LTV's Efforts with the CFIUS

Thomson also argues that LTV failed to provide it adequate assistance in obtaining the approval of the CFIUS necessary to secure the President's approval under the Exon–Florio Amendment. The Bankruptcy Court found with respect to the CFIUS that LTV in fact expended considerable efforts to respond to requests for information from the CFIUS, devoting 20 LTVAD employees to work long hours on the responses and sending LTV employees to lengthy CFIUS meetings at which they answered questions from members of the CFIUS. The Bankruptcy Court also found that LTV's extensive responses to CFIUS's requests for information supported Thomson's position. *See Chateaugay II*, 186 B.R. at 573–75.

Ignoring the Bankruptcy Court's factual findings concerning the efforts of LTV personnel in the CFIUS process, Thomson claims that the Bankruptcy Court erroneously equated compliance with the CFIUS's requests for information with LTV's obligation to use all "reasonable efforts." Thomson complains that the "only arguable assistance" LTV provided with respect to the CFIUS process was the submission of two pages of helpful information "buried" in two inches of other "relatively meaningless information." Thomson Mem. at 35–36.

Thomson's characterization of LTV's efforts with regard to the CFIUS process is grossly inaccurate. The record in this action demonstrates, as the Bankruptcy Court found, that LTV did far more to assist Thomson with the CFIUS than supply "two pages" of helpful information. Indeed, the only alleged shortcoming of LTV that Thomson can point to is LTV's failure to display the helpful information it provided to the CFIUS more prominently. Accordingly, the Court finds that LTV made reasonable efforts to assist Thomson with the CFIUS process in accordance with section 7.01 of the Agreement.

### 3. LTV's Efforts with Congress

Thomson next contends that the Bankruptcy Court erred in finding that section 7.01 of the Agreement "did not require LTV to lobby members of Congress to change their opinions with respect to Thomson's acquisition." *Chateaugay II*, 186 B.R. at 595. In so finding, the Bankruptcy Court detailed the substantial efforts of LTV on Thomson's behalf in the congressional arena, which included numerous contacts with members of Congress. *See id.* at 577–78. The Bankruptcy

---

9. "R." refers to the Record on Appeal in this action.

Court also noted that although Thomson "complain[ed] about various things that it thought LTV could or should have done differently to assist Thomson[,] [v]irtually all of these things would have been useless gestures that LTV reasonably determined would have been counterproductive or would have been deleterious to LTV's business no matter who its owner was." *Id.* at 578.

The Court affirms the legal conclusion of the Bankruptcy Court that LTV's duty under section 7.01 to use reasonable efforts to consummate the transaction with Thomson did not stretch so far as to require it to make futile gestures or to engage in activity harmful to its own interests. *See Bloor,* 601 F.2d at 614. LTV's strategy decision not to waste lobbying efforts on those members of Congress who had already expressed opposition to Thomson's acquisition of the Missiles Division was a good faith business judgment. In any event, Thomson does not challenge the Bankruptcy Court's factual finding that, at Thomson's request, LTV *did* contact certain members of Congress who had gone on record as being opposed to Thomson's bid. *See Chateaugay II,* 186 B.R. at 578, ¶ 111 ("At Thomson's request, LTV contacted numerous members of the Texas delegation, including some members who had publicly proclaimed opposition to Thomson's acquisition...."); ¶ 115 ("Although [Senator David] Boren and [Congressman Dave] McCurdy had expressed opposition to the transaction, ... a member of LTV's Board ... contacted them and spoke to them in favor of the transaction."). Accordingly, the Court finds that LTV's efforts to gain congressional support for Thomson's acquisition of the Missiles Division were not in breach of its duties under section 7.01 of the Agreement.

#### 4. LTV's Other Efforts

Thomson also argues that the Bankruptcy Court erroneously focused on a number of "meaningless tasks" LTV performed in reaching its conclusion that LTV complied with the Agreement. In addition to the efforts discussed above, these other tasks included developing and implementing a plan of action to assist Thomson in consummating the acquisition, issuing press releases demonstrating LTV's support of Thomson, mobilizing LTV's employees to assist with the plan, and communicating with Thomson. *See Chateaugay II,* 186 B.R. at 566–69.

The Court disagrees with Thomson's assertion that the Bankruptcy Court focused on insignificant acts of LTV while turning a blind eye toward LTV's failure to perform other vital duties. As discussed in the preceding sections, the Bankruptcy Court thoroughly analyzed LTV's efforts in the areas identified by Thomson as crucial to the success of the transaction. That the Bankruptcy Court also noted other activities of LTV in reaching its decision does not undermine its legal determination that LTV complied with section 7.01 of the Agreement. In effect, Thomson improperly urges that the Bankruptcy Court should have speculated about what other steps LTV could have taken to assist Thomson instead of examining the good faith efforts it did make. *See Triple–A Baseball Club Assocs.,* 832 F.2d at 227–28 ("While a best efforts clause requires good faith activity in light of the party's own capabilities and expertise, once such activity is demonstrated, it is clearly erroneous for a court to speculate as to what other steps the party should have taken.").

#### 5. The Effect of the CFIUS Opposition on Thomson

Thomson also attacks the factual finding of the Bankruptcy Court that "Thomson withdrew from the transaction not because of its problems with the DOD, which might have been solved if it had agreed to a voting trust, but rather because it knew that it could not get CFIUS approval." *Chateaugay II,* 186 B.R. at 591. As this finding is supported by substantial evidence, it is not clearly erroneous.

As the Bankruptcy Court observed, Thomson faced substantial opposition in the CFIUS process. The storm of protest in Congress to Thomson's acquisition of the Missiles Division created pressure on the Bush Administration to reject the proposal. Indeed, General Brent Scowcroft, National Security Adviser to President George Bush, advised representatives of Thomson in a meeting on June 9, 1992 that his office had never before received so much negative input from congressional sources on one sub-

ject. *See Chateaugay II*, 186 B.R. at 590; R.50 at 806–07 (Bell deposition testimony). Therefore, even if it was able to obtain a security agreement agreeable to the DOD, Thomson most likely could not have obtained the approval from the President required by the Exon–Florio Amendment. Given these circumstances, the Court does not find that it was clearly erroneous for the Bankruptcy Court to infer that Thomson's prospective inability to secure CFIUS's approval caused it to withdraw from the transaction.

## II. LTV Did Not Communicate with Martin in a Manner Designed to Subvert Thomson's Acquisition of the Missiles Division

■ Thomson claims that the Bankruptcy Court erred in finding that (1) contacts between representative of LTV and either Martin or Lockheed after it approved the Agreement "were minimal and did not have the purpose or effect of subverting Thomson's acquisition," *Chateaugay II*, 186 B.R. at 591, and (2) that LTV did not contact Martin to discuss a bid for the assets of LTVAD "until after Thomson terminated the ... Agreement on July 28, 1992." *Id.* The Court reviews these factual findings of the Bankruptcy Court for clear error. Under this standard, the Court may not upset the Bankruptcy Court's factual findings unless it is "'left with the definite and firm conviction that a mistake has been committed.'" *Travellers Int'l*, 41 F.3d at 1574 (quoting *United States v. United States Gypsum Co.*, 333 U.S. 364, 395, 68 S.Ct. 525, 541–42, 92 L.Ed. 746 (1948)).

The Court finds that the Bankruptcy Court did not err in finding that contacts between LTV and Martin or Lockheed between April 10 and July 28, 1992 were minimal and did not harm Thomson's acquisition efforts. There is abundant evidence in the record to support the Bankruptcy Court's finding. *See* R.39 at 87–88, 182, R.63 at 94–95, R.66 at 123, 168 (substantiating view that LTV supported Thomson's bid and preferred Thomson to Martin and Lockheed); R.39 at 87–88, R.62 at 288–89, 296–97, R.393 at 123 (supporting position that LTV did not believe that Martin and Lockheed would renew their bid if Thomson and Carlyle failed to close).

The Bankruptcy Court also did not err in finding that LTV did not contact Martin to discuss a bid for LTVAD's assets until after Thomson terminated the Agreement on July 28, 1992. Thomson contends that this finding is belied by a letter, dated May 29, 1992, from Martin's counsel to LTV's bankruptcy counsel in which the former stated that Vought had a "continuing interest" in acquiring LTVAD's assets and suggested that LTV should conduct further discussions "in terms of a no bidding context." Although the Bankruptcy Court did not address the letter explicitly in its decision, the letter is consistent with the Bankruptcy Court's finding that LTV did not contact Martin with the intent of subverting Thomson's bid. First, the letter reflects that it was Martin, not LTV, that initiated contact. Second, there is no evidence that any LTV official actually saw this letter.[10] Finally, even if LTV officials had seen the letter, there is no evidence that it had the purpose or effect of subverting Thomson's bid; to the contrary, the evidence shows that LTV assisted Thomson substantially in its acquisition efforts.

## III. The Bankruptcy Court Properly Dismissed Thomson's Fifth Counterclaim For Termination of the Agreement

■ Thomson next contends that the dismissal of its fifth counterclaim, based on the Frost Amendment, was erroneous. In the fifth counterclaim, Thomson alleged that the Frost Amendment provided it with an independent and legally sufficient reason to terminate the Agreement on July 28, 1992. On

---

**10.** Although Thomson argues that it is unrealistic to assume that LTV's counsel did not share the letter with LTV officials, it is unable to point to any evidence to support an inference that the letter was shown to LTV officials. LTV, on the other hand, cites evidence in the record indicating that such an inference would be unjustified. Mr. Hoag and James Powers, the former Chief Financial Officer of LTV, both testified that they had not been shown this letter and were not aware of its contents. R.39 at 140–41 (Hoag trial testimony on January 30, 1995); R.62 at 307–11 (Powers deposition transcript).

this appeal, Thomson contends that the Frost Amendment permitted termination of the Agreement under the common law doctrines of frustration of purpose and impossibility and under section 13.01(iii) of the Agreement.[11] The Court reviews the Bankruptcy Court's dismissal of the claim *de novo*. *In re Chateaugay Corp.*, 104 B.R. 637, 642 (S.D.N.Y.1989).

Thomson and Carlyle agreed to assume responsibility between them for all obligations under the Aircraft and Missile Divisions' employees' collective bargaining agreement. *See Chateaugay I*, 155 B.R. at 655; R.393 at 430 (transcript of Thomson's counsel at April 10, 1992 hearing stating "Carlyle will assume the liabilities of the collective bargaining agreement with respect to the aircraft workers and Thomson will assume those liabilities with respect to the missile division workers."). Thomson contends that the Frost Amendment materially changed these obligations, giving rise to a right on its part to terminate the Agreement. The Court disagrees.

Congressman Frost introduced the proposed Frost Amendment to the House of Representatives on May 27, 1992. Although the amendment passed the House of Representatives before the scheduled closing date of the Thomson transaction, it was not enacted into law until October 23, 1992. The amendment was a measure to ensure that the entity which ultimately purchased LTVAD's assets assumed payment of benefits to LTVAD's unionized retirees under their collective bargaining agreement. Section (a)(2) of the Frost Amendment precludes a sale of "all or any part of [LTVAD's] assets to any other person or entity unless the person or entity agrees to assume, to the extent required under any collective bargaining agreement entered into by [LTVAD], all the liabilities of [LTVAD] to all of the employees of [LTVAD] who have retired." Section (c)(1) of the amendment further provides that "[i]f a person or entity ... purchases [LTVAD] during the period [between April 1, 1992 and 60 days after the date of enact-

ment] ... the purchaser [shall] assume all the liabilities of [LTVAD] to all of the employees of such company who have retired (including all the liabilities described in subsection (a)(2))."

Thomson's entire argument with respect to the Frost Amendment rests on an untenable reading of that statute. It claims that sections (a)(2) and (c)(1), read together, make Thomson independently responsible for the retired employees of *both* the Missiles and Aircraft Divisions. However, the Court finds that because (a)(2) clearly provides that a purchaser—here Thomson—must assume obligations to LTVAD's employees only *"to the extent required under any collective bargaining agreement,"* the Frost Amendment merely would have reimposed an obligation upon Thomson that Thomson had already agreed to assume. Although Thomson argues that the generalized language of section (c)(1) that the purchaser must assume *"all* the liabilities of the [LTVAD] to *all* of the employees of such company"* (emphasis added) broadens the specific obligation of section (a)(2), rules of statutory construction provide otherwise: "[I]t is a commonplace of statutory construction that the *specific* governs the *general."* *Morales v. Trans World Airlines*, 504 U.S. 374, 384–85, 112 S.Ct. 2031, 2037, 119 L.Ed.2d 157 (1992) (emphasis added) (citing *Crawford Fitting Co. v. J.T. Gibbons, Inc.*, 482 U.S. 437, 445, 107 S.Ct. 2494, 2499, 96 L.Ed.2d 385 (1987)); *see also United States v. LaPorta*, 46 F.3d 152, 156 (2d Cir. 1994) ("Under long-standing principles of statutory construction, a general section of a statute must give way to a specific one."). Further substantiating the Court's interpretation, section (c)(1) expressly incorporates the obligations of section (a)(1). Because the Court therefore finds that the Frost Amendment did not change Thomson's obligations in any respect, it holds that the Frost Amendment did not frustrate or make impossible Thomson's closing of the transaction and did not provide Thomson with a right to

---

**11.** Section 13.01(iii) permits either party to terminate the Agreement "at any time prior to closing ... should a federal law be enacted or become applicable that makes the Purchase and Sale contemplated [by the Agreement] or the consummation of the Closing illegal or otherwise prohibited."

terminate the Agreement under section 13.01(iii).

## IV. Thomson's Payment of the $20 Million Break–Up Fee Will Not Unjustly Enrich LTV

■ Finally, Thomson disputes the Bankruptcy Court's legal determination that LTV would not be unjustly enriched if it was awarded the $20 million reverse break-up fee. It contends that payment of the fee to LTV would constitute unjust enrichment because: (1) LTV received more from the eventual sale of the Missiles and Aircraft Divisions than it would have if Thomson's bid succeeded; and (2) LTV acted inequitably by frustrating Thomson's acquisition and favoring Vought's bid. The Court reviews *de novo* the legal conclusion of the Bankruptcy Court.

■■ Unjust enrichment is found where one party has been enriched at another party's expense and acceptance and retention of the benefit under the circumstances would be unjust. *Dolmetta v. Uintah Nat'l Corp.,* 712 F.2d 15, 20 (2d Cir.1983). A finding of unjust enrichment is a legal inference to be drawn from the surrounding circumstances and the parties' relationship. *Sharp v. Kosmalski,* 40 N.Y.2d 119, 123, 386 N.Y.S.2d 72, 76, 351 N.E.2d 721, 724 (1976).

The Court finds that LTV will not be unjustly enriched by the receipt of the reverse break-up fee since it would merely be receiving the benefit of its bargain with Thomson. Thomson agreed in open court and in writing to pay the $20 million fee under the very events that have transpired. Thomson's promise to pay the fee played an integral role in the Bankruptcy Court's decision to approve Thomson's bid. *See Chateaugay II,* 186 B.R. at 597. The Court finds no activity on LTV's part that would justify depriving it of what it is entitled to under the Agreement. Moreover, whether LTV ultimately received more or less for the Missiles and Aircraft Divisions is irrelevant to Thomson's unconditional obligation to pay the break-up fee. *See In re United Merchants & Mfrs., Inc.,* 674 F.2d 134, 142 (2d Cir.1982) (propriety of liquidated damages clause measured under " 'circumstances existing as of the time that the agreement is entered into rather than at the time that the damages are incurred or become payable' ") (quoting *Walter E. Heller & Co. v. American Flyers Airline Corp.,* 459 F.2d 896, 898–99 (2d Cir. 1972)). Thomson must therefore comply with its covenant in section 6.06(a) of the Agreement to pay the $20 million reverse break-up fee. There is nothing unjust about requiring a party to honor its legal obligations.

### *CONCLUSION*

For the reasons stated above, the Court affirms the orders of the Bankruptcy Court in *Chateaugay I* and *Chateaugay II.* The appeal is dismissed in its entirety. The Court orders this case closed and directs the Clerk of Court to remove it from the active docket.

**SO ORDERED.**